# 24-2434



In the

# United States Court of Appeals

## For the Second Circuit

◆

LINDA BERGNES, on behalf of themselves and classes similarly situated, MANUEL CARVAJAL, on behalf of themselves and classes similarly situated, ROBERTO ISAZA, on behalf of themselves and classes similarly situated, GUADALUPE ORNELAS, on behalf of themselves and classes similarly situated, HECTOR TOMASI, on behalf of themselves and classes similarly situated, TERESA VENDITTO, on behalf of themselves and classes similarly situated, GUADALUPE ALVAREZ, on behalf of themselves and classes similarly situated, CARLOS COLLAZO and on behalf of themselves and classes similarly situated,

*Plaintiffs-Appellants,*

*(See inside cover for continuation of caption)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK (NEW YORK CITY)

## BRIEF FOR PLAINTIFFS-APPELLANTS

ARTHUR ZACHARY SCHWARTZ
ADVOCATES FOR JUSTICE, CHARTERED ATTORNEYS
*Attorney for Plaintiffs-Appellants*
225 Broadway, Suite 1902
New York, New York 10007
(212) 285-1400
aschwartz@advocatesny.com

————————————————

– and –

MARISOL CORNIELLE, on behalf of themselves and classes similarly situated,
RAFAEL FORTICH, on behalf of themselves and classes similarly situated, LAURA
GONZALEZ, on behalf of themselves and classes similarly situated, KIMBERLY
HERNANDEZ, on behalf of themselves and classes similarly situated, HOE YEN LEE,
on behalf of themselves and classes similarly situated, ARNOLD S. LEMUS, on behalf
of themselves and classes similarly situated, RONALD E. LOPEZ, on behalf of
themselves and classes similarly situated, Julio Lucero, on behalf of themselves and
classes similarly situated, LUIS R. LUGO, on behalf of themselves and classes similarly
situated, EDWARD C. LUK, on behalf of themselves and classes similarly situated,
WANDA NEGRON, on behalf of themselves and classes similarly situated, DAVID B.
OLSON, on behalf of themselves and classes similarly situated, Oscar Ore, on behalf of
themselves and classes similarly situated, Sandy Rand, on behalf of themselves and
classes similarly situated, JULIO ROSA, on behalf of themselves and classes similarly
situated, ALEKSANDRA SAGAN, on behalf of themselves and classes similarly
situated, GLENYS SALDANA, on behalf of themselves and classes similarly situated,
YANET SANTIAGO, on behalf of themselves and classes similarly situated, MICHAEL
SOFRONAS, on behalf of themselves and classes similarly situated, CYNTHIA VIAU,
on behalf of themselves and classes similarly situated, JOSE ORIZ ESCOBAR, on behalf
of themselves and classes similarly situated and NEW YORK COMMUNITIES FOR
CHANGE, on behalf of Spanish and other Foreign Language Speaking
Court Users and Potential Court Users,

*Plaintiffs-Appellants,*

– v. –

JOSEPH A. ZAYAS and CAROLYN GRIMALDI,

*Defendants-Appellees,*

– and –

NEW YORK STATE UNIFIED COURT SYSTEM,
OFFICE OF COURT ADMINISTRATION,

*Defendant.*

————————————————

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................... iii

INTRODUCTION ........................................................................1

STATEMENT OF SUBJECT MATTER AND APPELLATE
JURISDICTION..........................................................................2

STATEMENT OF THE ISSUES PRESENTED........................................2

STATEMENT OF THE CASE...........................................................3

   A.    The Proceedings Below.......................................................3

   B.    Statement of Facts ............................................................6

      Background...................................................................7

      The Facts...................................................................12

      Federal Court Interpreter Compensation Benchmark ...................18

      Qualifications and Testing ...............................................20

      Compensation..............................................................22

      The Job of Court Interpreter and Current NYS Job Title ................23

      The Work of Court Interpreters .........................................23

      Court Interpreter Knowledge, Skills, and Abilities (KSAs) .............25

      Court Interpreter Testing..................................................27

      Written and Oral Testing..................................................28

      Test Outcomes.............................................................30

      Other Factors Which Should Be Relevant to Pay Rates ..................31

      A.  Court Interpreter Classification as Professional.........................31

      B.  Education.................................................................32

C. Second Language Acquisition....................................................33

D. The Work Is Stressful and Hazardous.........................................35

Court Interpreters Are Necessary to Prevent Language Discrimination ..........36

Discriminatory Animus Is Rampant in the New York Court System...............46

STANDARD OF REVIEW ...............................................................50

ARGUMENT ...............................................................................50

POINT I:  PLAINTIFF NEW YORK COMMUNITIES FOR CHANGE IS A PROPER ASSOCIATIONAL PLAINTIFF.....................................50

POINT II:  THE INDIVIDUAL PLAINTIFFS' ALLEGATIONS SUFFICIENTLY PLEAD AN EQUAL PROTECTION CLAIM BASED ON NATIONAL ORIGIN....................................................................56

CONCLUSION .............................................................................633

CERTIFICATE OF COMPLIANCE .....................................................64

# TABLE OF AUTHORITIES

## Cases

Aerospace and Agr. Implement Workers of America v. Brock, 477 U.S. 274 (1986).................................................................................... 55, 56

Bell Atl. Corp. v. Twombly, 550 U.S. 544 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).................................................................................... 61, 62

Burgis v. New York City Dept. of Sanitation, 798 F.3d 63 (2nd Cir. 2015).... passim

Clapper v. Amnesty Int'l USA, 568 U.S. 398 (2013)................................51

Dane v. UnitedHealthcare Ins. Co, 974 F.3d 183 (2d Cir. 2006) ..........................50

Gen. Bldg. Contractors Ass'n v. Pennsylvania, 458 U.S. 375, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982) ...............................................................57

Havens Realty Corp. v. Coleman, 455 U.S. 363 (1982)............................53

Hazelwood Sch. Dist. v. United States, 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977)...............................................................59

Hudson v. Int'l Bus. Machines Corp., 620 F.2d 351 (2d Cir.1980) .......................59

Hunt v. Washington State Apple Advert. Comm'n, 432 U.S. 333 (1977)... 50, 51, 52

International Union, United Auto., Aerospace and Agr. Implement Workers of America v. Brock, 477 U.S. 274 (1986)................................. 52, 53, 54

John v. Whole Foods Mkt. Grp., Inc., 858 F.3d 732 (2d Cir. 2017)......................51

Korematsu v. United States, 323 U.S. 214 (1944)....................................57

Locust Valley v. Town of Oyster Bay, 868 F.3d 104 (2d Cir. 2017)......................52

Lomotey v. CT Dep't of Transp., 355 Fed.Appx. 478 (2d Cir. 2009)....................60

Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992) ...............................51

NAACP v. Alabama ex rel. Patterson, 357 U.S. 449 (1958) ..................................56

National Motor Freight Assn. v. United States, 372 U.S. 246 (1963)....................55

*Ottaviani v. State Univ. of New York at New Paltz,* 875 F.2d 365
(2d Cir. 1989) ...................................................................59

*Palmer v. Shultz,* 815 F.2d 84 (D.C. Cir. 1987)............................59

*Prairie Rivers Network v. Dynegy Midwest Generation, LLC*, 2 F.4th 1002
(7th Cir. 2021) ...................................................................52

*Retired Chi. Police Ass'n v. City of Chicago,* 7 F.3d 584 (7th Cir. 1993) ..............54

*Richardson v. City of New York*, 2018 WL 4682224 (S.D.N.Y. 2018)........... 61, 62

*Robinson v. Metro-N. Commuter R.R. Co.*, 267 F.3d 147 (2d Cir. 2001) .................5

*Saint Francis Coll. v. Al–Khazraji,* 481 U.S. 604 (1987).........................................57

*Shakman v. Clerk of Cook Cnty.*, 994 F.3d 832 (7th Cir. 2021).............................54

*Sierra Club v. Morton,* 405 U.S. 727 (1972) ............................................................55

*Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26 (1976) ......55

*Soule by Stanescu v. Connecticut Ass'n of Schs.*, 57 F.4th 43 (2d Cir. 2022).........50

*Speech First, Inc. v. Killeen*, 968 F.3d 628 (7th Cir.), *as amended on denial
of reh'g and reh'g en banc* (Sept. 4, 2020) ............................................53

*Spokeo, Inc. v. Robins*, —— U.S. ——, 136 S.Ct. 1540, (2016) ............................51

*United Food & Commercial Workers Union Local 751 v. Brown Grp., Inc.*,
517 U.S. 544 (1996) ...................................................................53

*United States v. City of New York,* 717 F.3d 72 (2d Cir.2013)................................59

*Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72 (2d Cir. 2015) .................57

*Vill. of Freeport v. Barrella,* 814 F.3d 594 (2d Cir. 2016)............................... 56, 57

*Wal–Mart Stores, Inc. v. Dukes,* 564 U.S. 338 (2011) ..............................................5

*Warth v. Seldin*, 422 U.S. 490 (1975)....................................................... 51, 52, 55

## Statutes

42 U.S.C. Section 1981 ............................................................... 57, 59

42 U.S.C. § 1983 .................................................................. 3, 51, 54

42 U.S.C. § 2000d .................................................................. 38, 43

U.S. Constitution, Article III ............................................... 51, 53, 55

## Rules

FRCP Rule 12(b)(1) ................................................................ 50, 52

# APPELLANT'S BRIEF

# INTRODUCTION

The action underlying this appeal is an action by an organizational representative of foreign-language Court users, and a class action lawsuit by Court Interpreters, alleging that the leaders of the NY State Court System preside over promote and knowingly preserve, and refuse to correct discriminatory pay practices throughout the New York State Court System, because those Interpreters are largely of non-United States national origin, either by birth or ancestry, are employees who associate with Court users who are of non-United States origin, and because the New York Court system intentionally refuses to provide non-discriminatory language access to those who have difficulty speaking and hearing English. As a result, though highly skilled, those Interpreters are paid significantly less than all other Courtroom personnel employed in New York Courts, because many of them are foreign born, are of foreign ancestry and because their skills are used to provide Court access to non-English speaking, limited-English speaking individuals or persons with hearing disabilities. Additionally, as a consequence, non-English speaking Court users are denied full and equal access to the Court system.

The underlying action was dismissed, on standing grounds (for the organizational plaintiffs) and on "failure to state a claim grounds" as to the Court Interpreters.

Appellants assert that their Complaint, which cites both extensive statistical evidence, and data about comparators in other tiles, and examples of blatant hostility on the part of Court personnel to Court Interpreters, made a plausible enough claim to survive a Motion to Dismiss.

## STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION

This appeal is from a Decision and Order of US District Judge Ronnie Abrams dated August 12, 2024 (JA217-240[1]) granting a Motion to Dismiss, and the Judgment dismissing the case on August 13, 2024 (JA241). There was no-cross appeal.

The timely Notice of Appeal was filed on September 11, 2024 (JA252)

This Court has jurisdiction pursuant to 28 USC Sec. 1291.

## STATEMENT OF THE ISSUES PRESENTED

**Issue 1:** Did the District Court properly conclude that Plaintiffs failed to state a pay discrimination claim because Plaintiffs do not allege a materially equivalent comparator group?

---

[1] References to the Appendix are noted as "JA."

**Issue 2:** Did the District Court properly conclude that Plaintiffs failed to state a pay discrimination claim because, even if they had established a materially equivalent comparator group, Plaintiffs failed to plausibly allege an inference of intent to discriminate?

**Issue 3:** Did the District Court properly conclude that Plaintiff New York Communities for Change lacks standing to bring this 42 U.S.C. § 1983 action on behalf of its members or on behalf of itself as an organization?

## STATEMENT OF THE CASE

### A.    The Proceedings Below

The individual appellants (all N.Y. State Court Interpreters) filed their employment discrimination Complaint on May 25, 2022. (JA5). They filed a First Amended Complaint, which added New York Communities for Change as a Plaintiff (whose claim involved failure to provide language services to litigants speaking languages other than English), suing only the New York State Unified Court System/Office of Court Administration ("OCA") on October 5, 2022. (JA16-58). The OCA filed a Motion to Dismiss on November 10, 2022 (JA59), seeking dismissal on Eleventh Amendment grounds. In a Decision dated June 28, 2023, Judge Ronnie Abrams granted the Motion to Dismiss (JA61-71), but with leave to replead against individual State actors under 28 USC Sec.1983,

On July 25, 2023, Appellants filed a Second Amended Complaint, naming Joseph Zayas, Chief Administrative Judge, and Carolyn Grimaldi, Director of Human Resources for OCA. (JA72-172), which included a 2017 Report issued by the NY Unified Court System addressed to the failures of OCA to ensure language access in the New York Court System (JA 115-172).

Appellees file a new Motion to Dismiss, alleging that the Complaint still violated the Eleventh Amendment, and also asserting that the Second Amended Complaint failed to assert a claim. (JA183). The Opposing Declaration of Arthur Schwartz included, among other documents, an announcement from the OCA dated November 1, 2023 (JA213-14) of an increase in pay for Court Interpreters, because of a decline in interpreters taking the exam, in order to "realign compensation in this title to that offered in other states in the region" and in order to "recognize[] the knowledge and skills that this diverse group of employees demonstrate."

On August 12, 2024, Judge Abrams issued her Opinion, denying the Motion to Dismiss on 11th Amendment grounds, but finding a lack of standing on the part of NY Communities for Change ("NYCC"), and a failure to state a claim on the part of the individuals. (JA217-240). In part Judge Abrahms held, with respect to NYCC that "NYCC does not plausibly allege, however, that it has suffered a concrete, particularized, and actual or imminent injury-in-fact *independent of* that

suffered by its members." With respect to the employment discrimination claim brought under the 14th Amendment, Judge Abrams concluded a) that "Plaintiffs fail to plausibly allege that they are "similarly situated in all material respects" to any comparator group, and that.

> Even if Plaintiffs could show that court reporters are similarly situated to court interpreters, they also fail to plausibly allege "circumstances giving rise to an inference of discrimination," *Brown*, 756 F.3d at 229. Plaintiffs argue that they have done so because their allegations are "principally statistical" and that "statistics alone may be sufficient to warrant a plausible inference of discriminatory intent." Pl. Br. at 44. But "to show discriminatory intent in a[n] … Equal Protection case based on statistics alone, the statistics must not only be statistically significant in the mathematical sense, but they must also be of a level that makes other plausible nondiscriminatory explanations very unlikely." *Burgis v. New York City Dep't of Sanitation*, 798 F.3d 63, 69 (2d Cir. 2015); *see Robinson v. Metro-N. Commuter R.R. Co.*, 267 F.3d 147, 158 (2d Cir. 2001), *abrogated on other grounds by Wal–Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011).

> Plaintiffs have not met this burden, as they offer no direct evidence of discriminatory intent but only vague statistics and conclusory allegations, which are "insufficient to support plausibly the key intentional conduct element of Plaintiffs' federal discriminatory treatment claim."

This appeal (JA252) followed.

**B.**    **Statement of Facts**[2]

Plaintiff/Appellant New York Communities for Change ("NYCC") is a not-for-profit membership corporation located in Brooklyn, New York, which is a social justice organization engaged in housing, climate justice, civil rights, and employment organizing. Its work is principally done in the Spanish-speaking community and a large number of its members are Spanish speakers. NYCC is an organizational plaintiff which sues on behalf of its members who are not primarily English-speaking.

The individual plaintiffs/appellants (see JA 74-80 for the full list and where each one works) are employees employed by the New York State Unified Court System and/or its administrative arm, the Office of Court Administration. They are of varying national origins and interpret for court users in numerous languages.

Defendant/Appellee Joseph A. Zayas is the Chief Administrative Judge of the New York State Unified Court System ("UCS"). Defendant Carolyn Grimaldi was the Director for the Department of Human Resources for the Office of Court Administration ("OCA"), the administrative arm of the UCS. Both are sued as individuals who have acted under color of state law to deprive both plaintiff NYCC and the individual Court Interpreters, and their class, of equal protection of the law.

---

[2] This Statement of Facts is wholly drawn from the Second Amended Complaint.

**Background**

The Supreme Court of the United States has held that failing to take reasonable steps to ensure meaningful language access for Limited English Proficient ("LEP") persons is a form of national origin discrimination.[3] The United States Department of Justice's guidance[4] and subsequent technical assistance letters from its Civil Rights Division explain that Court systems receiving federal financial assistance, either directly or indirectly, must provide meaningful access to LEP persons.

The enactment of the Court Interpreter Act in 1978 is often cited as the seminal moment in the emergence and development of Court interpreting as a profession.[5] Although the Act does not govern the state Courts, it has served as the prototype for all subsequent language access laws and rules in the country. The Court Interpreter Act and all ensuing Court Interpreter canons are formulated in accordance with the standard of "legal equivalence," which demands that all LEP Defendants/Appellants have the right to be in a legal position equivalent to that of

---

[3] *Lau v. Nichols*, 414 U.S. 563 (1974).

[4] U.S. Department of Justice (2002). _Guidance to Federal Financial Assistance Recipients Regarding Title VI Prohibition Against National Origin Discrimination Affecting Limited English Proficient Persons_, 67 Fed. Reg. 41 455.

[5] Susan Berk-Seligson. *The Bilingual Courtroom*. Second Edition (University of Chicago Press, 2017), 1.

a native English speaker possessing a similar level of education and intelligence.[6] This means that Court Interpreters have to interpret both idiomatically and verbatim, with due attention to the linguistic register of the speaker, and without omissions or embellishments.[7] This extremely ambitious standard has led to the ever-increasing professionalization of Court Interpreters over the 40 years since the Act became law. Nevertheless, at the same time that the State of New York and the profession in general have come closer and closer to realizing the ideal of legal equivalence (with the foreseeable consequence that the demand for Court Interpreters able to meet that standard has risen dramatically), compensation for Interpreters in the state's Court system, when adjusted for inflation, has stagnated.

The notion that bilingualism in and of itself enables one to interpret is an unfortunate and persistent myth. Yet this notion is best dispelled by the fact that, of 1,075 approved applicants who participated in the 2015-2016 New York State Spanish Court Interpreter exam cycle, only 106 passed, or 10% of the total—and that only after the written and oral exams were graded on a curve to furnish enough candidates to allow the state to fill Interpreter vacancies (before the curve, the number of successful examinees was dramatically lower). By way of comparison,

---

[6] Roseann Dueñas González, Victoria F. Vásquez, and Holly Mikkelson, *Fundamentals of Court Interpretation: Theory, Policy and Practice,* 2nd ed. (Durham: Carolina Academic Press, 2012), 14.

[7] *Code of Ethics*, 7.

the overall Certified Public Accountant (CPA) Exam pass rate hovers between 45% and 50%; 68% percent of the candidates for the New York State Bar Exam passed in 2017; and an average of around 90% of the U.S. Medical Licensing Examination ("USMLE") non-foreign candidates to become practicing MDs passed in 2017. The fact that all of these professionals have to undergo rigorous formal training as a bar to taking the exam only underscores the fact that the 7% of Interpreters who were able to pass the last test were, at minimum, bringing to the table the mastery of at least two languages in much more than their legal vocabularies. Indeed, as New Jersey's "Overview for the Oral Examination for Prospective Interpreters" states: "Court Interpreters [...] must be extraordinarily bilingual, possessing a highly educated, native-like ability in both English and a second language."

Obviously, this goes beyond a mere highly educated bilingualism.[8] However, due to the particular versatility required to accurately interpret multiple

---

[8] Language Services Section (LSS), Programs and Procedures Unit Office of Management and Administrative Services, Administrative Office of the Courts, "Overview of the Oral Examination for Prospective Interpreters," (Trenton: January 2019), 1, https://njCourts.gov/forms/10294_oralexam_appl.pdf

Simultaneous interpreting requires use of at least 22 cognitive skills at any given moment. Roseann Dueñas González, Victoria F. Vásquez, and Holly Mikkelson. *Fundamentals of Court Interpretation: Theory, Policy and Practice,* 1st ed. (Durham: Carolina Academic Press, 1991), 176.

lexicons, it is, paradoxically, only recently that interpreting has become an academic major or title, and that only at a few universities. While the expertise has, of course, existed since the first societies began to interact, the levels of ever-increasing specialization demanded to perform in more specific settings can only be certified by experts in the respective subfield. So, while many judiciaries with less demanding exams also require that their Court Interpreters have a bachelor's degree of some kind, others, such as New York, are principally concerned that applicants be able to pass an examination designed by specialists in the field, while the educational requisite to take the exam is a high school diploma. An unfortunate side effect of this approach is the assumption that this means that New York Court Interpreters are only required to have a high school diploma and should be remunerated accordingly.

---

See also New Jersey Courts, "Knowledge, Skills, and Abilities (KSAs) for the Profession of Court Interpretation," accessed February 2, 2019, https://www.njCourts.gov/public/assets/langSrvcs/ksa.pdf?cacheID=fxM2M7A

Just in terms of vocabulary, as the Federal Court Interpreters Orientation Manual sets out, "While Court interpreting may appear to be a field that primarily requires knowledge of legal vocabulary, the subject matter to be interpreted is often quite diverse. In an average criminal trial, sophisticated legal arguments will be interpreted, as well as the testimony of handwriting, ballistics, fingerprint, chemical, DNA, and drug experts. Interpreters must have a broad active and passive vocabulary and an excellent knowledge of regionalisms, idioms, and dialectical variations of the countries in which their language is spoken. Court Interpreters must have these variations of language readily available due to the diversity of witnesses and defendants." Court Services Office, Administrative Office of the United States Courts, "Federal Court Interpreter Orientation Manual and Glossary," last revised May 8, 2014, 23.

In reality, however, most Interpreters are highly educated. An anonymous survey conducted among its members by the Interpreters' Chapter of Local 1070 of District Council 37 of the American Federation of State, County, and Municipal Employees, the union that represents Interpreters in New York City Courts, found that of 70 respondents to the survey, 60 held degrees in higher education. Of the 60, 7 held Associates Degrees. 53 more held at least a Bachelor Degree, while of those 53, 14 had Master Degrees, one had a PhD, and 3 held JD degrees. The results of a second study conducted by the union among 40 Interpreters in Courts in New York County (about half the total Interpreters in Manhattan Courts) are even more emphatic: 36 advanced degrees, among them two Associates, 34 Bachelors, 13 Masters, and one PhD.[9]

Dispensing justice fairly, efficiently, and accurately should be a cornerstone of the judiciary. Court Interpreters are necessary to secure the rights of deaf, hard of hearing and LEP persons who cannot be fully protected in legal proceedings unless qualified Interpreters assist them. To that effect, the UCS has approximately 246 full- and part- time Court Interpreters in 20 foreign languages and American

---

[9] Court Interpreter Chapter, AFSCME DC 37 Local 1070, "Interpreter Survey," questionnaire (New York: February 2018).

Sign Language.[10] Court Interpreters work bi-directionally, from and into the English language, using the three modes of interpreting: simultaneous, consecutive and sight. Language industry surveys show that Interpreters are a highly educated majority female and majority immigrant workforce.

**The Facts**

There are three levels of staff Court Interpreters in the New York State Courts: Court Interpreters, Senior Court Interpreters, and Principal Court Interpreters. Court Interpreters are responsible for interpreting between English and a foreign language in the Courtroom and other settings. Staff Interpreters may also assist LEP persons in filling out forms and may perform clerical tasks such as filing or answering inquiries, and other related duties.

The Federal Judiciary sets a benchmark for both quality and compensation. In 2008, the Judicial Conference of the United States (the national policy-making body for the federal Courts) adopted a new "landmark standard" setting grade JSP-14 for all federal staff Court Interpreter positions.

In 2008, the Judicial Conference of the United States adopted the following policy as recommended by its Committee on Judicial Resources:

> Staff Court Interpreter positions are highly specialized and present unique challenges for fitting into the new CPS salary

---

[10] New York State Unified Court System (2017). Ensuring Language Access: A Strategic Plan for Ensuring Language Access in the New York Courts, p. 5, annexed as Exhibit A.

> progression policy due to the difficulties in making meaningful distinctions on the fundamental elements of the Interpreters' work, the Committee recommended that the Conference approve the conversion of the staff Court Interpreter position from the CPS to the JSP, effective October 13, 2008.[11]

Court Interpreters in the NY UCS are paid substantially less than this federal benchmark because of the unlawful discriminatory approach defendant takes to paying them. This pay disparity does not exist for other job titles in the UCS. The last time that Court Interpreters were reclassified by the UCS was in 1994, when they were raised from a judicial grade of 16 to their current line 18.

| TITLE | SALARY RANGE | | NYS DIFFERENTIAL | |
|---|---|---|---|---|
| | NYS | Federal | Min Salary | Max Salary |
| Court Reporter | $81,254 – $131,923 | $91,511 – $105,237 | -11% | +25% |
| Court Clerk | $69,852 – $99,057 | $49,297 – $86,879 | +42% | +14% |
| Court Officer | $63,358 – $90,160 | $75,961[12] | -17% | +19% |
| Court Interpreter | $60,245 – $85,886 | $120,580 – $156,758 | -50% | -45% |

Court Interpreter compensation is also not in proper relationship to similar job titles in State service. The Court reporter title, which is the closest group of professional employees to Interpreters, provides another point of comparison and illustrates another significant disparity. Court Reporters, unlike Court Interpreters, are mainly people who are not foreign-born, and transcribe 100% in English, servicing all users of the Court system, who are mainly native-born English

---

[11] Report of the Proceedings of the Judicial Conference of the United States. September 16, 2008, p. 26.

[12] Number based on what a federal security Court officer, a private contractor, would make at $36.52 an hour for 40 hours a week times 52 weeks.

speakers. Despite similarities in the nature of the job and skills required, a non-supervisory Court Interpreter in the UCS earns 26% less than a non-supervisory Court reporter at the entry level and 35% less at the top of the salary range. In contrast, in Federal Court, maximum salaries for Interpreters are 49% higher than top salaries for reporters.

Key facts illustrate deficiencies in the current job title and the unequal treatment of Court Interpreters:

- Advanced fluency in a second language—close to native speakers—is typically reached after seven and one-half years of learning the language. The NYS Office of Court Administration does not recognize much less quantify the acquisition of a second language as a qualification for the Court Interpreter title.

- Though the UCS job title only requires a high-school diploma, industry surveys show that at least 76% of Interpreters surveyed are, in fact, college graduates, post-graduates or doctoral graduates.

- The single most important qualification that Court Interpreters must have—passing the civil service exam (or the equivalent)—does not appear in the Court Interpreter job title.

- Risk factors unique to Court interpreting are not properly accounted for by the UCS. Interpreters work in potentially violent, stressful, and high

conflict environments, which have been documented to cause burnout, depression and/or vicarious trauma.

- Court reporters share several Knowledge, Skills, and Abilities ("KSAs") with Court Interpreters but many of these KSAs do not appear in the Court Interpreter job title. Indeed, the Court Interpreter KSAs—originally issued in 1986 and unchanged in the 1994 version—neither reflect current industry standards nor the actual qualifications required of New York's staff Court Interpreters.

- Court interpreting is a more demanding profession than Court reporting due to the difference between the phonetic-bound translation performed by Court reporters as compared with the culture-bound translation performed by Court Interpreters as well as the necessity of working in two languages rather than one.

- 55% of Court Reporting candidates pass the UCS's civil service exam whereas the pass rate for Spanish Court Interpreters is 10%.

- UCS staff Court Interpreters are paid about half of what their federal counterparts are compensated, while the salaries for UCS Court Reporters, Senior Court Clerks Court Officers, and Court Attorneys are not only comparable to those of their Federal counterparts but, in most cases, higher.

- While in the Federal Courts the compensation for the Court Interpreter title (JSP-14) is set higher than the Court Reporter title (comparable to JSP-12), the UCS compensates the Court Interpreter title (JG-18) much less than the Court Reporter titles (JG-24 to 27). The salary range for JSP-14 in 2019 was $120,580 – $156,758.

- The maximum Federal Court compensation for the Court Interpreter title is equal to that of a Law Clerk, while the maximum compensation for the Federal Court Reporter title is 33% less. In the NY Court system, Court Interpreters make 35% less than Court Reporters in maximum compensation.

- In order for NYS Court Interpreters to be treated equitably and consistent with the treatment of other job titles in UCS, their salary grade would need to be reallocated from JG-18 to JG-31.

Recent postings of job vacancies in the United States District Courts state that the salary range for the Court Interpreter position is JSP 11-14. However, a study published in 2016[13] found that Federal District Courts in the New York/New Jersey region hire Court Interpreters at the JSP-14 level because this is the entry-

---

[13] Robert Joe Lee and Francis W. Hoeber (Winter 2016). "Interpreter Compensation in the Courts: A Descriptive Study," in 31 COURT MANAGER 10. (The data for this finding are reported in Chapter Two of the United States Court Interpretation Database.)

level position consistent with the Judicial Conference's policy. Even if hired as JSP 11s, it takes only three years to become a JSP 14.

Currently, NYS salaries for Court Reporter (JG-24 and JG-27), senior Court clerk (JG-21) and Court officer (JG-19) are not only comparable to those of their federal counterparts but, in most cases, higher.[14] In contrast, NYS Court Interpreters are paid about half of what their federal counterparts are compensated.

This stark disparity in compensation is not based on a valid assessment of the skills, knowledge, experience, and qualifications actually required to provide this critical service in the judicial system. It is based on the type of work Interpreters do, their overwhelming foreign-born familial national origin and the clients they associate with. Moreover, given that other positions in the UCS which are not filled primarily by persons who are foreign-born, or immediate descendants of foreign-born parents, are compensated in line with or above Federal Court compensation, the disparate treatment (lower pay) of Court Interpreters discriminates against this class of employees, and also results in mistreatment of and denial of equal access to those represented in this action by NYCC, who speak languages other than English who are not being served by the most qualified Interpreters due to the level of pay paid to Interpreters.

---

[14] Federal "locality" rates in the NY-NJ-CT-PA region for Court Reporter (CR Level 1 – CR Level 4); Court Clerk (CL 25 – CL 26); and Court Interpreter (JSP 14). NYS salaries include a $4,200 "location" pay.

**Federal Court Interpreter Compensation Benchmark**

One of the key factors that drives the compensation of many job types is the degree to which the work is viewed to constitute a profession with standards of performance that must be demonstrated on a valid and reliable certification exam rooted in the profession's documented knowledge, skills, and abilities (KSAs). Court interpretation is a profession that has been evolving for almost four decades, maturing from a service sometimes viewed as a necessary evil to a profession on par with long-established professions such as Court reporting. Many studies have shown how up through the early 1980s Court Interpreters were often viewed and treated as glorified clerical personnel who were asked to do a job that "any bilingual person" could perform—with a corresponding low compensation. There were few standards and the few that existed were not based on empirical studies of the actual KSAs that the job entails. There was very little professional training available in either academic or non-academic contexts and no strong professional associations of Court Interpreters to promote professionalism.[15]

---

[15] To see the level of professionalism in one nearby state in the early 1980s, see the final report of the New Jersey Supreme Court Task Force on Interpreter and Translation Services, EQUAL ACCESS TO THE COURTS FOR LINGUISTIC MINORITIES. Trenton: Administrative Office of the Courts, 1985, especially pp. 82ff. and background reports 3, 7- 9, 12, 15, 16 and 22. For a historical overview, see Chapter 4, "The Profession of Court Interpretation," in Roseann Dueñas González, Victoria E. Vásquez and Holly Mikkelson, FUNDAMENTALS OF COURT INTERPRETATION: THEORY, POLICY, AND PRACTICE. Second edition. Durham: Carolina Academic Press, 2012.

That state of affairs began to end when, after Congress passed the Court Interpreters Act of 1978, the Administrative Office of the United States Courts ("AOUSC") embarked on developing a certification exam based on a robust study of the KSAs of Court interpretation in the Federal trial Courts. An interdisciplinary team of experts was assembled that traversed the country, conducting a thorough investigation of what judges and other legal professionals expected a competent Interpreter to do, and then developed a certification process that would yield professionals who have demonstrated the ability to perform those KSAs.[16]

The development of the Federal Court Interpreter certification exam had a significant impact on compensation. The best summary is provided by González et al.:

> In sum, the impact federal certification had on the professional status of Court Interpreters in an area that traditionally had been highly resistant to change was remarkable. The Government Service (GS) level of Court Interpreters prior to 1978 was 5 to 7, which translated to approximately $10,000 to $14,000 per annum. This pay level doubled after implementation of Public Law 95-539, when the starting salary for certified staff Interpreters was elevated to GS 10, or $26,261 to $34,136 per year. An additional pay rate was instituted in 1985, which significantly increased both daily contractor rates—from

---

[16] Detailed descriptions of this massive endeavor are available in Etilvia Arjona, "The Court Interpreters Test Design," in L. Elías-Olivares, E.A. Leone, R. Cisneros and J.R. Gutiérrez, eds. SPANISH LANGUAGE USE AND PUBLIC LIFE IN THE UNITED STATES. Berlin: Mouton de Gruyter, 1985. pp. 185-200; Chapter 46, "Federal Certification," in González et al., supra; and Seltzer v. Foley, 502 F. Supp. 600 (S.D. NY 1980).

$175 to $210 per day—and staff rates—to an entry level of GS 10 to 13. In 2000, the daily contractor pay rate was raised to $305 per day, while the staff rates increased to an entry level of JSP 11 to 14, or $57,408 to $125,695 per year. In 2010, daily contractor rates were at an all time high of $388 per day…, but staff starting pay remained in JSP 11 to 14 range…. Clearly, the value of the linguistic and interpreting skills for federal Interpreters has increased tremendously over time.[17]

**Qualifications and Testing**

Both Court Reporter (JG-24) and Court Interpreter (JG-18) job title descriptions include the requirement of a high school diploma or the equivalent. In addition, the Court Interpreter qualification provides an alternative to the high school diploma: an equivalent combination of education and experience or tested proficiency in English and another language.

In contrast, both Court Reporter job titles (non-supervisory) require experience or experience and training:

- **Court Reporter (JG-24):** "…three (3) years of general verbatim reporting experience or, graduation from a formal program in Court reporting and two (2) years of general verbatim reporting experience."

- **Senior Court Reporter (JG-27):** "One [1] year of permanent competitive class service as a Court reporter; or Four [4] years of recent

---

[17] Roseann Dueñas González, Victoria Vásquez, and Holly Mikkelson (2012). *Fundamentals of Court Interpretation: Theory, Policy and Practice*, 2nd ed., p. 173. Durham, N.C.: Carolina Academic Press.

general verbatim reporting experience; or Successful completion of a program in general verbatim reporting from a recognized school and three (3) years of satisfactory full-time experience in general verbatim reporting."

Since high school students do not acquire the ability to do stenographic reporting, it makes perfect sense to include a formal program and/or experience requirement for Court reporters. The same holds true for Court Interpreters since high school graduates have surely not developed the requisite KSAs either. This shows how inapplicable the high school diploma qualification is for the profession of Court interpretation.

The JG-24 Court Reporter job title description, and the JG-18 Court Interpreter job title description do not state that passing a performance test administered by the UCS, or any other entity, is a required qualification.

The single most important qualification that both Court Reporters and Court Interpreters must have—passing their respective civil service exams (or the equivalent)does not appear in the JG-18 Court Interpreter title description. Since current hiring practices require candidates for both professions to take and pass exams with two parts (knowledge plus performance), the respective job titles are largely incomparable.

However, about half (55%) of JG-24 Court Reporter candidates pass the UCS Civil Service Exam,[18] whereas Spanish Court Interpreters pass at the much lower rate of 10%.[19] This considerable difference in passing rates is an indicator that Court interpreting is a more challenging profession than Court reporting.

**Compensation**

The UCS has set the maximum compensation levels for the Court Reporter titles (JG 24-27) consistent with Federal compensation and recognizing the KSAs required for the job.

Federal Court compensation for Court Interpreters is set significantly higher than for Court reporters, and equal to that of Law Clerks.[20] In contrast, the UCS compensates Interpreters much less than reporters.[21]Court Interpreters in the NY State Court system are largely foreign born, or second generation from foreign born families. Their clients are 100% foreign-born. Court Reporters are largely Caucasian, and do not come from a foreign-born background. The contrasts between what is paid to Interpreters and Court Reporters is not only stark, but it also skews from the contrast in the Federal system, where Interpreters make 32%

---

[18] New York State Unified Court System (2017). Court Reporter – Exam No. 45-796.

[19] New York State Unified Court System (2016). Court Interpreter (Spanish) – Exam No. 45-788.

[20] *Supra* note ___.

[21] *Id.*

more than Court Reporters. This chart, developed in 2021, clearly shows the distinction:

| | | Salary Range | | Interpreter Salary Difference | |
|---|---|---|---|---|---|
| | | Min | Max | Min | Max |
| Federal | Interpreter | $120,580 | $156,758 | +32% | +49% |
| | Reporter | $91,511 | $105,237 | | |
| New York State | Interpreter | $60,245 | $85,886 | -26% | -35% |
| | Reporter | $81,254 | $131,923[22] | | |

### The Job of Court Interpreter and Current NYS Job Title

New York State's current Court Interpreter title description was issued in 1986 and slightly amended in 1994. Even though the UCS has made some progress since then to expand and improve language access for parties in the Court system,[23] the basic content of the NYS Court Interpreter job title has not been updated in thirty-six years. The current job title does not reflect the consensus of scholarship and practice in the field over all those years, leaving New York's Court Interpreter pay rate outdated and inadequate, and clearly discriminatory.

### The Work of Court Interpreters

To help the Courts reach the goal of ensuring equal access to justice for all, Court Interpreters must possess native-like mastery in two languages as well as

---

[22] Combined range of JG-24 and JG-27 Court reporter titles.

[23] The New York State Unified Court System implemented a strategic plan in 2006 to ensure quality language access in the UCS and issued reports in 2011 and 2017 on the progress and continuing implementation of the plan.

high level interpreting skills.[24] Court Interpreters are required to accurately and faithfully reproduce what was spoken or signed in one language into another language without embellishment or omission, while preserving the language level and register of the speaker.[25]

In order to interpret accurately, Interpreters must master both working languages' cultural context[26] and be able to prepare for specialized topics rapidly and routinely. To add to the complex nature of their job, Interpreters must also know and use various forms of both working languages because they regularly work with a wide range of language users. Court Interpreters interact with people with high levels of education and corresponding high levels of formal speech (e.g., judges, attorneys, and expert witnesses) as well as people with little to no formal education and corresponding highly informal ways of speaking.

To interpret for such a broad range of speakers, an Interpreter must have an ample repertoire of vocabulary and be able to handle language that ranges from subject-specific terminology to colloquialisms, regionalisms, and slang. Moreover,

---

[24] Romberger, Wanda and William E. Hewitt (2006). "Wanted: Career Paths for Court Interpreters," p. 80 in *Future Trends in State Courts*. Williamsburg, Virginia: National Center for State Courts.

[25] New York State Unified Court System, *supra* note 6 at 7.

[26] Interpreting: Getting it Right. American Translators Association. Accessed on October 23, 2018; United States Courts. Court Administration and Services Careers.

to ensure the public's trust in the judiciary, Court Interpreters are required to observe high standards of professional conduct.[27]

### Court Interpreter Knowledge, Skills, and Abilities (KSAs)

The highly complex work of Court Interpreters requires the appropriate knowledge, skills, and abilities to perform at the standards set by the UCS to ensure language access. There has been significant movement to describe the traits of a competent Court Interpreter and the nature of the job since the title description was issued in 1986 (though qualifications and KSAs remain unchanged since 1994). Other Courts around the country have made significant inroads to identify the traits of a competent Court Interpreter. The Federal Courts recognize that the KSAs required of a Court Interpreter are highly complex.[28] The National Center for State Courts published the results of a nationwide assessment of Court interpreting that took a comprehensive view of the profession, including a chapter entitled "Job Analysis and Position Descriptions for Professional Court Interpreters," in 1995.[29] A study of California's Court Interpreter certification exam conducted in 2007 identified a broad range of KSAs essential to Court

---

[27] New York State Unified Court System, *supra* note 6 at Appendix A.

[28] United States Courts. Court Interpreter Knowledge, Skills, and Abilities. [For a full list of the federal Court Interpreter KSAs, contact the Administrative Office of the U.S. Courts.]

[29] William E. Hewitt (1995). Chapter 3 in Court Interpretation: Model Guides for Policy and Practice in the State Courts. Williamsburg, VA: National Center for State Courts.

interpretation. The California Judicial Council applied the same KSAs in 2010 to evaluate the National Center for State Courts' certification exam.[30]

Court interpreting is a developing profession, and even these well-founded KSAs in other Court systems do not include all aspects of the job. For example, the ability to exercise professional judgment in a wide range of scenarios to comply with ethical standards is underrepresented. The Language Services Program manager for New Jersey's Administrative Office of the Courts recommended augmenting the California KSA's with additional skills and abilities that are vital to the day-to- day work of a Court Interpreter. These include exercising situational control (knowing how to handle impediments to performing interpreting duties), switching back and forth among the modes of interpreting appropriately, employing note-taking techniques and working effectively in a team of Interpreters, among others.[31]

---

[30] Judicial Council of California/Administrative Office of the Courts. (2007). *KSA's Essential for Court Interpretation*. [*See* Appendix 5] <u>*Study of California's Court Interpreter Certification and Registration Testing*</u>. Prepared by ALTA Language Services, Appendix 4 of *California's Assessment of the Consortium for Language Access s in the Courts' Exams*: Judicial Council of California 2010 report by ALTA Language Services, Inc.

[31] New Jersey AOC, Language Services Section, Office of Management and Administrative Services. <u>Becoming an Arabic Court Interpreter</u>, at Appendix A.

**Court Interpreter Testing**

The UCS's 2017 report *Ensuring Language Access: A Strategic Plan for Ensuring Language Access in New York Courts* (Exhibit A) acknowledges that "assessing qualifications to serve as a Court Interpreter is critical to achieving a successful language access program."[32]

Courts increasingly recognize that Interpreters who have not been properly tested and trained, certainly will have trouble understanding or accurately conveying valuable information, including a broad range of legal terminology,[33] and untrained bilinguals are a major risk in an interpreted encounter.[34]

The *Ensuring Language Access* report on progress implementing the strategic plan concludes, "enhanced testing and assessment of prospective Interpreters, including development of oral examinations in additional languages" is among the achievements of the 2006 and 2011 strategic plans on language access.[35] According to the Court System's Plan, the UCS "has developed and

---

[32] *Ensuring Language Access*, *supra* note 3 at 11.

[33] U.S. Department of Justice (2016). Language Access in State Courts, p. 8. Civil Rights Division, Federal Coordination and Compliance Section.

[34] American Translators Association. Interpreting: Getting it Right.

[35] *Ensuring Language Access*, *supra* note 3 at 2.

administers a rigorous and comprehensive assessment program to evaluate the skills and qualifications of prospective Interpreters."[36]

**Written and Oral Testing**

For foreign language Interpreters, a written English exam is a first step to qualify as a staff Interpreter. The English proficiency exam is rigorous; typically, 40% of candidates pass. Due to the high demand for Spanish and the number of Spanish staff Interpreters hired, Spanish Interpreters take a rigorous bilingual written exam.[37]

Candidates who are successful on the written exam are required to take an oral exam to assess an applicant's ability to provide complete and accurate renditions going in both directions, between English and the other language, in three modes of interpreting: consecutive, simultaneous, and sight translation. Oral

---

[36] *Ensuring Language Access*, *supra* note 3 at 6.

[37] *Id*. at 6. ("There is a different process for testing and hiring of staff Spanish Court Interpreters. In light of the high demand for Spanish and the number of Spanish staff Interpreters hired, the UCS has developed a competitive civil service examination. The two-part examination first requires candidates to pass a three-hour, multiple-choice test of their bilingual skills, probing candidates' grammar, vocabulary, word usage, sentence structure and reading comprehension, in both Spanish and English. The written test also assesses candidates' ability to translate from English to Spanish and Spanish to English. Candidates who pass this written examination qualify to take a one-hour oral examination, which includes viewing a video and interpreting everything spoken in Spanish to English and from English to Spanish, in simultaneous and consecutive modes. Final grades are based on performance on both the written and oral components of the examination, and candidates are ranked and selected for employment from an eligible list in compliance with state civil service law and rules.")

assessment examinations are required for all staff Interpreter positions. Oral exams are given in 22 languages that account for eighty percent of the interpreting needs in the Courts.[38] Interpreters for the deaf and hard of hearing must meet rigorous requirements of the Registry of Interpreters for the Deaf, Inc. ("RID") the Chief Judge's recognized credentialing authority. Interpreters holding this credential may be placed on the NYS Registry of per diem Court Interpreters.

The qualifications of American Sign Language Interpreters employed by the Court system are assessed by a different process. By statute, the Chief Administrative Judge must name one or more credentialing authorities to certify Interpreters in American Sign Language to serve in the New York Courts. See Judiciary Law § 390. The Registry of Interpreters for the Deaf ("RID"), a nationally recognized professional association that offers rigorous examinations and certifications, has been named as the credentialing authority for the New York Courts. Section 390 also requires that the state provide Interpreter services in all proceedings where a party or a witness is deaf and in all criminal proceedings in state-paid Courts where the crime victim or any member of the immediate family is deaf.

---

[38] Albanian, Arabic, Bengali, Bosnian/Croatian/Serbian, Cantonese, French, Greek, Haitian Creole, Hebrew, Hindi, Italian, Japanese, Korean, Mandarin, Polish, Portuguese, Punjabi, Russian, Spanish, Urdu, Vietnamese, and Wolof.

**Test Outcomes**

Many people believe that interpreting can be performed by almost anyone who is bilingual. The word "bilingual" covers a wide range of communicative competence. At one end is the person who has total mastery of two languages as a native speaker with high levels of formal education in both languages. At the other end of the spectrum is the person who, while a "native speaker" of one language, has used that language only in informal situations such as family and work contexts and has completed limited formal education in that language, and is at an early stage of acquiring a second language.

Professional Interpreters are bilingual at the top end of that range both in terms of language usage and level of education. This is illustrated by two facts. First, university interpreting programs test applicants' language mastery in both languages since, without this foundation, there is no basis for teaching or learning interpreting skills. Second, all available statistics for Court interpreting certification exams consistently show a high failure rate. One of the reasons for this is that anyone may take the tests. This open-access policy has been deemed essential due to the widespread lack of sufficient numbers of certified Interpreters and the fear of using some educational or other prerequisite that might result in some false negatives, i.e., persons who could pass the test but that would be

screened out by such prerequisites for which there is no empirical data to indicate their validity.

**Other Factors Which Should Be Relevant to Pay Rates**

**A.     Court Interpreter Classification as Professional**

Courts across the United States, other than New York, have recognized that Interpreters are "skilled professionals." The National Center for State Courts states that "Interpreters are highly skilled professionals" who fulfill an essential role in the administration of justice.[39] The Administrative Office of the United States Courts holds that federally certified Court Interpreters are "highly skilled professionals" who bring to the judicial process specialized language skills.[40] Considering the difficulty of Court interpretation, the Virginia Court System maintains that a qualified Court Interpreter is therefore "a highly skilled, impartial language professional."[41]

---

[39]  William E. Hewitt (1995). Chapter 9, "Model Code of Professional Responsibility for Interpreters in the Judiciary," p. 199, in Court Interpretation: Model Guides for Policy and Practice in the State Courts. Williamsburg, VA: National Center for State Courts.

[40] Administrative Office of the United States Courts, Court Services Office (2014). Federal Court Interpreter Orientation Manual and Glossary, Appendix 3: Court Interpreter Ethics and Protocol.

[41] Virginia Court System. Serving Non-English Speakers in the Virginia Court System: Guidelines for Policy and Best Practice, p. 3-2.

The Equal Employment Opportunity Commission has classified the job of Interpreter as "professional" just as with the jobs of judge, lawyer and doctor.[42] The American Bar Association holds that the delivery of appropriate language-access services in legal proceedings depends upon the provision of competent and well-trained "professional" Interpreters.[43] ASTM International, a recognized leader in setting private industry and government standards, also designates language interpreting as a "professional activity."[44]

### B. Education

Since Court Interpreters must be "equipped to understand the grammatically and syntactically complex language of the Court—14th to 18th grade level (González, 1977)—and produce a meaningful legally equivalent interpretation with grammatical, structural, semantic, and pragmatic accuracy,"[45] it is unreasonable to expect that a high school graduate with no college education will be up to the task.

---

[42] U.S. Equal Employment Opportunity Commission. EEO-1 Job Classification Guide 2010.

[43] American Bar Association (2012). Standards for Language Access in Courts.

[44] ASTM International. *4.3 Characteristics of Interpreting.* Standard Practice for Language Interpreting.

[45] Dueñas González et al., *supra* note 16 at 21.

Empirical data from the field shows that 86% of NYS staff Court Interpreters surveyed held degrees in higher education.[46]

A study by Interpret America demonstrated that the vast majority of North American Interpreters are college-educated, with 79% holding a bachelor's degree or higher.[47] A survey conducted by the Interpreters Division of the American Translators Association found 97% of its Interpreters hold a college and/or a professional degree.[48]

## C.  Second Language Acquisition

The Office of Court Administration neither fully recognizes nor quantifies what goes into the acquisition of a second language as a qualification for the Court Interpreter title. In order to succeed on a Court Interpreter exam, however, a person must already have acquired knowledge, practice and a combination of education and experience in a second language to develop the requisite proficiency level

---

[46] Court Interpreter Chapter, Local 1070/AFSCME DC 37 (Feb. 2018). "Interpreter Survey." Questionnaire (N=70: HS diploma, 10; associate's degree, 7; bachelor's degree, 35; master's degree, 14; juris doctor degree, 3; PhD, 1).

[47] Nataly Kelly, Robert G. Stewart, and Vijayalaxmi Hegde. (2010). *The Interpreting Marketplace: A Study of Interpreting in North America*. InterpretAmerica. (N=1,140.)

[48] ATA Interpreters Division (May 2015). ATA Interpreters Division Report to ATA Board of Directors: Survey Results, Conclusions and Recommendations. (N=536: 34% of its Interpreters hold an associate's and/or bachelor's degree while 63% have a master's and/or doctorate and/or professional degree.)

"equivalent to that of a native speaker," as required under the NYS Court Interpreter title.

Many people who have taken four years of foreign-language courses cannot carry on a conversation in that language. Research in the field of second language acquisition shows that even students enrolled in immersion programs still produce non-native-like grammar when they speak, even after years of meaning-focused lessons in the second language.[49]

Experts agree that advanced fluency in a second language requires years of immersion.[50] Stephen Krashen, one of the foremost scholars on second language acquisition ("SLA"),[51] divides the process of SLA into five stages: preproduction, early production, speech emergence, intermediate fluency, and advanced fluency.[52] The final stage is typically reached after between five and ten years of learning the

---

[49] Merrill Swain (1991). "French immersion and its offshoots: Getting two for one." In Freed, Barbara. *Foreign language acquisition research and the classroom*. Lexington, MA: Heath. pp. 91–103.

[50] Language immersion, or simply immersion, is a technique used in bilingual language education in which a native language and a second language are used for instruction in a variety of topics, including math, science, or social studies with the overall goal of promoting bilingualism and, in many cases, biculturalism.

[51] Stephen Krashen (University of Southern California) is an expert in the field of linguistics, specializing in theories of language acquisition and development.

[52] The Room 241 Team (2012). Five Stages of Second Language Acquisition. Concordia University-Portland.

language at a level "close to native speakers,"[53] or 7.5 years on average. However, reaching the "advanced fluency" stage does not necessarily meet the criterion of "native-like mastery" required to pass Court Interpreter exams and provide accurate interpreting in the legal setting. One can deduce, then, that developing native-like mastery in a second language requires a minimum of 7-10 years of immersion and practice in a second language.

### D. The Work Is Stressful and Hazardous

Hazards and risks related to employment. These include well-documented factors that can affect the quality and accuracy of the Interpreter's performance: fatigue,[54] burnout,[55] depression[56] and vicarious trauma.[57] Working in close

---

[53] Judie Haynes (2007). *Getting Started With English Language Learners: How Educators Can Meet the Challenge*. Alexandria, VA: Association for Supervision and Curriculum Development.

[54] Barbara Babbini Brasel (1976). *The Effects of Fatigue on the Competence of Interpreters for the Deaf* (after 30 minutes there is a slow but steady increase in error rate and after 60 minutes this increase becomes significant). *See also* Barbara Moser-Mercer (1998), Prolonged turns in interpreting: Effects on quality, physiological and psychological stress (provided evidence that prolonged turns lasting longer than 30 minutes have negative effects on the quality of an Interpreter's output and on his attitude towards the task).

[55] Hans Zeier (1998). Psychophysiological stress research. Interpreting (analogous to a study on burnout behavior of some air-traffic controllers, mental overload in simultaneous interpreting may change the attitude to the job. It is taken less seriously taken, and a certain carelessness occurs). *See also* Jorma Tommola and Jukka Hyönä (1990). Mental load in listening, speech shadowing and simultaneous interpreting: A pupillometric study (measured the variations in cognitive load during simultaneous interpreting and two other language processing tasks, listening, and shadowing, by means of pupillometry and found that SI was

proximity with inmates, interpreting in stressful and high conflict situations, and interpreting related to trauma experienced by victims, witnesses and litigants in the UCS are features of the job that Court Interpreters regularly encounter and that need to be more fully considered in the training, classification and allocation for this job title.

### Court Interpreters Are Necessary to Prevent Language Discrimination

In the end, the basic responsibility of Appellees Zayas and Grimaldi, as the responsible leaders of the Office of Court Administration, is the provision of unbiased, objective justice to the extraordinarily diverse population of the state of New York. In regard to language access, that responsibility is daunting. According to the Migration Policy Institute, almost 25% of New York City residents over the age of five (in a city of 8.5 million!) have limited English proficiency (LEP).[58] Not

---

associated with the highest dilation levels, associated with increased processing in the brain).

[56] Jin Ying (2008). The Conceptual Mapping Model in Consecutive Interpreting Teaching in *Learning Theories and Practice in Translation Studies* ("If the challenges caused by cognitive overload cannot be solved promptly, the Interpreter can become increasingly anxious and depressed, which can strongly affect the quality of his/her performance," p. 4).

[57] Miranda Lai and Sedat Mulayim (2015). Vicarious Trauma Among Interpreters (21.36% reported that the emotional distress was so severe it reduced the perceived quality of their onsite interpreting performance).

[58] Migration Policy Institute, "The Limited English Proficient Population in the United States," July 8, 2015, http://www.migrationpolicy.org/article/limited-english-proficient-population-united-states

only that—one sixth of New York City households "contain no English-proficient adults over the age of 14."[59] What these statistics reveal is a huge group of people—or rather, a huge group of diverse communities—whose access to justice depends on the Court system's ability to hire and maintain a large staff of qualified Court Interpreters (and this only in the five boroughs, without taking into account the considerable need for language access services in upstate Courts). New York State has also made the legal commitment to provide an Interpreter to any "party or witness, or interested parent or guardian of a minor party in a Family Court proceeding" as well as to any person "with limited English proficiency seeking assistance at the Court clerk's office."[60] In concrete terms this means that in New

---

Indeed, "according to the most recent federal census […] nearly 30 percent of New Yorkers—two and a half million people—primarily speak a language other than English at home, a rate more than 50 percent higher than the national average, and over two million New Yorkers are not fluent in English at all." In Wendy N. Davis, "Justice Moves Slowly for Those Who Need Interpreters," *ABA Journal*, March 1, 2016, http://www.abajournal.com/magazine/article/ justice_moves_slowly_for_those_who_need_Interpreters

[59] Legal Services NYC, "Interpreting Justice: Language Access in the New York Courts," accessed February 2, 2019, http://www.legalservicesnyc.org/what-we-do/ practice-areas-and-projects/civil-rights-initiative/interpretingjustice-language-access-in-the-new-york-Courts/introduction

[60] PART 217, "Access to Court Interpreter Services for Persons with Limited English Proficiency," *Uniform Rules for N.Y. State Trial Courts*, effective June 1, 2016, http://ww2.nyCourts.gov/rules/trialCourts/217.shtml

Judiciary Law - JUD § 390, "Equal access to Court proceedings for deaf or hard of hearing person," accessed February 2, 2019, https://codes.findlaw.com/ny/ judiciary-law/jud-sect-390.html

York State Courts, Interpreters interpret for witnesses, plaintiffs, defendants, and parents or guardians of minors at trials, conferences, and hearings; assist the clerk in providing information or receiving answers, motions, complaints, or any other judicial processes; interpret between attorneys and their clients in criminal, civil, housing, and family Courts; and interpret between pro se litigants and opposing parties in housing and civil Courts, among other duties.

Despite this growing need, since 2009 the number of Staff Interpreters employed by the Office of Court Administration has dropped steadily, from 335 in 2009, to 270 in 2013, to 246 in 2014.[61] The number is likely lower today. The decline in personnel has not gone unperceived by Court users and community stakeholders. A 2014 article in the New York Law Journal quotes the supervising attorney at MFY Legal Services as saying that "attorneys and their clients sometimes have to wait hours, or longer, for an Interpreter to arrive."[62] A year later, former New York City Comptroller Scott Stringer found much the same

---

See also Title VI of the Civil Rights Act of 1964, SUBCHAPTER V—FEDERALLY ASSISTED PROGRAMS: §2000d. "Prohibition against exclusion from participation in, denial of benefits of, and discrimination under federally assisted programs on ground of race, color, or national origin," accessed February 2, 2019, https://www.gpo.gov/fdsys/pkg/USCODE-2008-title42/html/USCODE-2008-title42-chap21-subchapV.htm. Several other federal and New York State Interpreter canons exist.

[61] Christine Simmons, "Finding Court Interpreters Poses Challenge for State Courts," *New York Law Journal,* October 28, 2014, 3.

[62] "Finding Court Interpreters," 2-3.

thing. According to the Comptroller, "wait times for Interpreters can often extend to many hours on any day, and…postponements of cases to another day because of a lack of interpretation services are not uncommon."[63] Even more recently, a 2017 report on language access by Legal Services of New York states that 74% of attorneys representing LEP clients had experienced Interpreter-related adjournments.[64] Given the state's responsibility to serve the needs of LEP Court users, in violation of Title VI of the Civil Rights Act of 1964, as well as state law and the rules of the New York State judiciary, the Unified Court System endangers the due process rights of LEP Court users when it fails to provide adequate interpretation services.

Language discrimination affects many Americans. LEP[65] persons are the group most frequently and severely affected by language discrimination. LEP individuals comprise a significant percentage of the population and are

---

[63] Scott Stringer, "Language Access in New York City Housing Courts," letter to Gail Prudenti, February 20, 2015, https://comptroller.nyc.gov/wp-content/uploads/2015/02/Prudenti-Housing-Court-Letter.pdf

[64] "Interpreting Justice," 10.

[65] In this essay, a LEP individual is defined as one who "[does] not speak English as their primary language and [has] a limited ability to read, speak, write, or understand English ... ."*Limited English Proficiency (LEP)*, LEP.GOV, http://www.lep.gov/faqs/faqs.html (last visited June 9, 2015).

predominately people of color, particularly Latinos.[66] Nearly ten percent of the

population in the United States is LEP.[67] That is approximately 29.5 million

people.[68] There is a tremendous correlation between race and English-speaking

ability in the United States. The vast majority, 87 percent, of LEP individuals are

people of color.[69] That is about 25.67 million people of color, of which an

estimated 21 million are Latino.[70] Despite popular perceptions to the contrary,

many LEP individuals are United States citizens. A conservative estimate is that 13

million United States citizens are LEP.[71] Jeh Johnson's report on racial bias in the

New York State Court system found that for litigants for which English is not a

primary language. Full access to the Court system was significantly impaired due

---

[66] MIGRATION POLICY INST., DATA BRIEF: LIMITED ENGLISH PROFICIENT INDIVIDUALS IN THE UNITED STATES: NUMBER, SHARE, GROWTH, AND LINGUISTIC DIVERSITY 6 (Dec. 6, 2011), *available at* http://migrationpolicy.org/sites/default/files/publications/LEPdatabrief.pdf ("Most LEP individuals speak Spanish. Spanish-speaking LEP individuals accounted for 66 percent of the total US LEP population in 2010.").

[67] *Id.* at 1.

[68] *Id.*

[69] PEW HISPANIC CTR., TABLE 20: LANGUAGE SPOKEN AT HOME & ENGLISH- SPEAKING ABILITY, BY AGE, RACE AND ETHNICITY: 2009 {2011), *available at* http://www.pewhispanic.org/2011/02/17/statistical-portrait-of-hispanics-in-the- united-states-2009/2009-statistical-portrait-23/.

[70] Jasmine B. Gonzales Rose, Language Disenfranchisement in Juries: A Call for Constitutional Remediation, 65 Hastings L.J., 811, 814.

[71] *Id.*

to the insufficient number of Interpreters. Jeh Johnson (2020) *Report from the Special Advisor on Equal Justice in the New York State Courts,* p. 28.

English-language requirements and preferences exclude and subordinate LEP people, particularly Spanish-speaking Latinos, in a variety of contexts, including employment, education, domestic relations, access to healthcare and public services, and participation in democracy. For example, private employers have increasingly imposed "English-only" rules in workplaces, which have been applied to humiliate, discipline, and fire workers, as well as exclude LEP customers, especially Latinos.[72] In public schools, students' violations of English-only rules have resulted in Latino students being sent to "Spanish detention" or suspended simply for speaking Spanish on school grounds.[73] Some Courts have even found speaking Spanish at home to be a form of child abuse and have threatened to remove custody from Latino parents unless they speak English to

---

[72] *See* Garcia v. Gloor, 618 F.2d 264, 266 (5th Cir. 1980). Garcia, a bilingual employee, was fired for speaking Spanish in an English-only workplace. The Fifth Circuit upheld the "English-only" rule, finding it did not impose hardship upon Garcia because he was bilingual and capable of speaking English. *Id. See also* Pedrioli, supra note 5, at 97; Juan F. Perea, *Ethnicity and Prejudice: Reevaluating "National Origin" Discrimination Under Title VII*, 35 WM. & MARY L. REV. 805, 826--27 (1994) [hereinafter *Ethnicity and Prejudice*] (discussing how Courts of appeal fail to recognize language restrictions in the workplace as a form of national origin discrimination).

[73] *Buscando America, supra* note 7, at 1443; Mirande, *supra* note 24, at 103.

their children.[74] Furthermore, LEP individuals face significant barriers when it comes to accessing healthcare and public services.[75] Even the ability to exercise the fundamental right to vote can be inhibited when accommodations are not provided to LEP citizens.[76] Further, LEP citizens are routinely excluded from jury service in most jurisdictions.[77]

LEP individuals are not the only people subject to language discrimination. Bilingual people, particularly bilingual Latinos, are also affected. A recent study revealed that 38 percent of Latinos in the United States are "Spanish dominant, 38 percent are bilingual, and 24 percent are English dominant."[78] This is not merely an immigrant issue. Nearly half of United States-born Latinos are not English dominant.[79] Widespread LEP language-based exclusions, coupled with accent and bilingualism discrimination, affect a large number of Latinos and other people of color in the United States but are often left out of discussions about race

---

[74] *Buscando America, supra* note 7, at 1445.

[75] Siddharth Khanijou, Note, *Rebalancing Healthcare Inequities: Language Service Reimbursement May Ensure Meaningful Access to Care for LEP Patients,* 9 DEPAUL J. HEALTH CARE L. 855, 857 (2005).

[76] Jocelyn Friedrichs Benson, *¡Su Voto Es Su Voz! Incorporating Voters of Limited English Proficiency into American Democracy,* 48 B.C. L. REV. 251 (2007).

[77] Gonzales Rose, *supra* note 68, at 815.

[78] PEW HISPANIC CENTER, WHEN LABELS DON'T FIT: HISPANICS AND THEIR VIEWS OF IDENTITY 4 (2012) *available at* http://www.pewhispanic.org/files/2012/04/PHC-Hispanic-Identity.pdf.

[79] *Id.*

discrimination. Racial discrimination is often expressed differently against Latinos than against African Americans. Most notably, language discriminations, which includes discrimination on the basis of actual or perceived English-language ability, bilingualism, and accent, is a common method of subordinating Latinos. For Latinos, language discrimination is not simply a linguistic issue; it is frequently a form of discrimination based on race or national origin. Language discrimination is challenging to address in the Courts because English-language requirements are often viewed as race-neutral, even when they serve to exclude or subordinate Latinos and other non-English speaking minorities. Jasmine B. Gonzales Rose (2014). *Race Inequity Fifty Years Later: Language Rights Under the Civil Rights Act of 1964*. Alabama Civil Rights & Civil Liberties Law Review, vol. 6, pp. 167–212.

Title VI of the Civil Rights Act of 1964 and its corresponding regulations provide protection against language discrimination and require in many instances that LEP individuals be provided language interpretation in order to meaningfully participate in public programs and activities. Title VI provides that, "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."[80] Despite the

---

[80] 42 U.S.C. § 2000d (2012).

lack of specific textual reference or mention of language in its legislative history, similar to the interpretation of Title VII, language discrimination has been recognized as a form of unlawful National Origin discrimination under the Fourteenth Amendment.[81]

On August 11, 2000, President William J. Clinton issued Executive Order 13166, "Improving Access to Services for Persons with Limited English Proficiency."[82] Executive Order 13166 requires federal agencies to examine the services they provide, identify the need for these services to LEP persons, and develop an approach so that LEP persons have meaningful access to these services.[83] The Order also requires that federal agencies make efforts to ensure that recipients of federal financial assistance also provide meaningful access to their services.[84] Specifically, federal agencies are required to: (1) develop a plan that provides LEP individuals meaningful access to the agency's programs and/or services; (2) issue agency-specific guidance to bring the agency's programs/ recipients of federal funds into compliance with Title VI, if the agency has not already done so; and (3) ensure that LEP individuals have input throughout the

---

[81] *DiMarco Zappa v. Cabanillas*, 238 F.3d 25 (1st Cir. 2001).

[82] Exec. Order No. 13166, 65 Fed. Reg. 50121 (Aug. 11, 2000).

[83] *Id.*

[84] *Id.*

process.[85] Both Title VI protection against language discrimination and the requirement that language interpretation be provided to LEP individuals have been applied to ensure access to the Courts.

Applied to the Courts, this four-factor test requires, among other things, that recipient Courts ensure that LEP litigants and witnesses receive language assistance.[86]

> At a minimum, every effort should be taken to ensure competent interpretation for LEP individuals during all hearings, trials, and motions during which the LEP individual must and/or may be present. When a recipient Court appoints an attorney to represent an LEP defendant, the Court should ensure that either the attorney is proficient in the LEP person's language or that a competent Interpreter is provided during consultations between the attorney and the LEP person.[87]

The main resistance to providing interpretation to litigants and jurors are concerns about cost and accuracy.[88] These two concerns are closely related. Accuracy of interpretation can only be guaranteed if the Interpreters are highly trained and certified. However, certified Interpreters are in limited supply and require considerable financial investment.[89] It is significant, however, that the

---

[85] *Id.*

[86] *Id.* at 41471.

[87] *Id.*

[88] Gonzales Rose, *supra* note 68, at 859.

[89] *Id.* at 862.

limited supply of certified Interpreters is itself a result of language discrimination. Any challenges to securing certified Court Interpreters should be scrutinized with the understanding that the shortage or cost obstacles (since presumably costs would be lower if there were a larger supply) have actually been brought about by discriminatory language policies.

### Discriminatory Animus Is Rampant in the New York Court System

The disparity in pay is not, as we discussed above, skill based. It is based on a discriminatory attitude towards Court Interpreters—because they provide a service which is not in English, and because those they serve are non-English speakers or people with disabilities.

- It is customary for Judges, Court Reporters and Court Clerks to a have desk inside a Courtroom and in an office, but it is not so for Court Interpreters, who are mostly immigrant minorities, despite having our own code of ethics and being classified as professionals by the EEOC.

- In some Courtrooms, Interpreters are the only staff to be seated outside of the well with the general public.

- When Interpreters are "allowed" to sit inside the well of a Courtroom, they are often told to sit in the jury box or a chair and are not provided desk space even when a desk, or space to include a desk, is available.

- In one Courtroom, a desk where Interpreters were "allowed" to sit was taken out to make room for a closet for prosecutors to hang their coats, and Interpreters were not provided an alternative designated desk space.

- In another Courtroom, used food containers and utensils were left on a desk at which Interpreters were "allowed" to sit. The day after an Interpreter complained to Courtroom management, the after-lunch mess was worse. The day after an Interpreter complained to the Court's upper management, the desk was removed from the Courtroom.

- A sergeant told an Interpreter to sit in the jury box and not at an unoccupied desk because people had to have a place to put their things (a water bottle, a purse, and a few Court files).

- In one Supreme Court 18B Part, in May 2021 a judge referred to the Court Interpreters as "chattel"; a not as yet completed investigation was spurred by a complaint from the Court Interpreter who was present.

- One Courthouse has had empty offices and cubicles with desks for years, but Interpreters are not allowed to sit there just in case other staff may be hired in the future; Interpreters continue to share a one-person cubicle or use a break room as an office.

- Break rooms are prioritized for clerks and officers over office space for Interpreters.

- Many staff Interpreters are not provided computers with internet access despite the need for research into language usage available from countries worldwide, and Interpreters must use their own laptop computers or cellphones to conduct research.

- In one Court, staff other than Interpreters are allowed to use their personal computers and cell phones, but Interpreters must ask for permission to use their own devices to conduct work-related language research.

- Many staff Interpreters are not provided with Court telephone lines and must use their own cellphones for Court business and operations without receiving reimbursement for their expenses.

- Some staff Interpreters do not have general-access keys or specific-room keys that are provided to other staff, forcing Interpreters to knock on doors or walk around portions of a building, even enter through a fire exit, to access their assigned workspace.

Many of these allegations were shared with Special Advisor Jeh Johnson.

When the NYSUCS sets compensation policies that do not show Court Interpreters the respect they should have as highly skilled professionals, and people see that job titles such as Court Clerks (who are also largely not persons of foreign National Origin) and Court Reporter are treated more professionally, it allows for

48

enhanced anti-immigrant and English-only discrimination to manifest itself rampantly throughout the New York State Courts.

Jeh Johnson's 2020 report on racial bias in the UCS has shed light on "systemic and institutional language discrimination" against both Court Interpreters and the litigants Interpreters serve. In one instance, his report discusses a Court office had a sign that read, "No Interpreters Allowed." Another sign placed on the only desk outside of a Courtroom well, read, "Interpreter Sits Here," and was accompanied by an illustration of a Mexican person sleeping (or rather taking a siesta) under a sombrero. In another office (says Johnson's report) in one Courtroom Court staff posted on a notice board a caricature of an Interpreter as part of "Misfit Island," meant as an offensive reference to the Island of Misfit Toys. Court staff and judges sometimes call Interpreters "interrupters." A Court assigned a Spanish Interpreter to an Italian-speaking-litigant. When the Interpreter told the judge that the litigant spoke Italian, not Spanish, the judge responded, "that's basically the same thing, go on." The report on racial bias also mentioned that Court staff incorrectly assume that an individual's inability to speak English means that the individual is unintelligent.

The discriminatory pay practices in the Court system, enforced and adhered to by Defendants/Appellants Zayas and Grimaldi, are a reflection of the

discriminatory attitude towards Court users who do not speak English, or who have disabilities.

## STANDARD OF REVIEW

A Court of Appeals "reviews *de novo* a district court's grant of a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted." *Soule by Stanescu v. Connecticut Ass'n of Schs.*, 57 F.4th 43, 54 (2d Cir. 2022). On a motion to dismiss, all factual allegations in the complaint must be accepted as true and all inferences must be drawn in the plaintiff's favor. *See Dane v. UnitedHealthcare Ins. Co,* 974 F.3d 183, 188 (2d Cir. 2006).

## ARGUMENT

## POINT I

## PLAINTIFF NEW YORK COMMUNITIES FOR CHANGE IS A PROPER ASSOCIATIONAL PLAINTIFF

The principal pleadings addressed to NYCC's associational standing are as follows:

> Plaintiff New York Communities for Change ("NYCC") is a not-for-profit membership corporation located Brooklyn, New York, which is a social justice organization engaged in housing, climate justice, civil rights, and employment organizing. Its work is principally done in the Spanish-speaking community and a large number of its members are Spanish speakers. NYCC is an organizational plaintiff which sues on behalf of its members who are not primarily English-speaking.

NYCC's claim is in all respects a Fourteenth Amendment claim; all NYCC seeks is injunctive relief: higher pay for Court Interpreters so that its members can have better access to the Court system. Plaintiffs did not plead jurisdiction under Section 1983, but also under 28 USC Sec. 1331. The Defendant ignores a huge body of law where the Supreme Court has allowed organizations to litigate over the denial of constitutional rights to persons who are among their members in cases where injunctive relief is sought, and not money damages.

The Second Circuit sets forth the respective burdens on a dispute over standing as follows:

> Article III of the Constitution restricts the "judicial Power" of the United States to "Cases" and "Controversies." U.S. Const. art. III, § 2. In light of that restriction, a party invoking the court's jurisdiction—the plaintiff—must have "standing" to sue. *See, e.g., Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013). To have standing, a plaintiff must establish three elements. *See, e.g., Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992). Specifically, a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, —— U.S. ——, 136 S.Ct. 1540, 1547, (2016) (citing *Lujan*, 504 U.S. at 560-61, 112 S.Ct. 2130). Significantly, each element "must be supported ... with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561, 112 S.Ct. 2130. At the pleading stage, a plaintiff need only "clearly ... allege facts demonstrating" each element. *Warth v. Seldin*, 422 U.S. 490, 518 (1975); *see also John v. Whole Foods Mkt. Grp., Inc.*, 858 F.3d 732, 736 (2d Cir. 2017) ("[B]ecause [the defendant] mounts only a 'facial' challenge to [the plaintiff's] allegations of standing, [the plaintiff]

> bears no evidentiary burden at the pleading stage."); *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016) ("When the Rule 12(b)(1) motion is facial, ... [t]he task of the district court is to determine whether the Pleading allege[s] facts that affirmatively and plausibly suggest that [the plaintiff] has standing to sue."

*Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 109 (2d Cir. 2017).

The standing allegations here are quite simple. NYCC is an organization with large numbers of Spanish speaking members, and the NY court system is providing fewer and fewer Interpreters in the Court system, because they are unwilling to spend the money needed to bring in, and maintain the employment of qualified Interpreters, and this denies non-English speaking members of NYCC equal access to the courts.

As a general proposition, "an association may have standing solely as the representative of its members." *Warth v. Seldin*, 422 U.S. 490 (1975). To establish associational standing, an entity must satisfy the three following prongs: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted, nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). "Associational standing … is derivative of—and not independent from—individual standing." *Prairie Rivers Network v. Dynegy Midwest Generation, LLC*, 2 F.4th 1002, 1008 (7th Cir. 2021).

Associational standing allows an organization to sue on behalf of its members "even without a showing of injury to the association itself." *United Food & Commercial Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 552 (1996); *but cf. Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79 (1982) (concluding that an organization had standing to sue in its own right based on institutional interests). To sue on behalf of its members, an association must show that: (1) at least one of its members would "have standing to sue in their own right"; (2) "the interests it seeks to protect are germane to the organization's purpose"; and (3) "neither the claim asserted nor the relief requested requires the participation of individual members." *Hunt v. Wash. State Apple Advert. Com'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977); *see Speech First, Inc. v. Killeen*, 968 F.3d 628, 638 (7th Cir.), *as amended on denial of reh'g and reh'g en banc* (Sept. 4, 2020). This three-part test for associational standing "guarantees the satisfaction" of Article III "by requiring an organization suing as representative to include at least one member with standing to present, in his or her own right, the claim (or the type of claim) pleaded by the association." *United Food*, 517 U.S. at 555. Associational standing, then, is derivative of—and not independent from— individual standing. *See id.* ("As *Hunt*'s most direct address to Article III standing, this first prong [of individual member standing] can only be seen as itself an Article III necessity for an association's representative suit.").

As to the third prong, which the District Court focused on in its discussion of this claim as a "Section 1983 claim," individual participation of the organization's members "is … plausibly read as dealing with situations in which it is necessary to establish 'individualized proof,' for litigants not before the court in order to support the cause of action." *Retired Chi. Police Ass'n v. City of Chicago*, 7 F.3d 584, 602 (7th Cir. 1993) (quoting *Hunt*, 432 U.S. at 344). Thus, "while the third prong of the *Hunt* test requires that a court conclude that 'neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit,'" the inquiry is remedy dependent. *Id.* at 602–03 (quoting *Hunt*, 432 U.S. at 343). "Declaratory, injunctive, or other prospective relief will usually inure to the benefit of the members actually injured and thus individualized proof of damages is often unnecessary." *Id.* (citing *Warth*, 422 U.S. at 515). *See*, *e.g.*, *Shakman v. Clerk of Cook Cnty.*, 994 F.3d 832, 840 (7th Cir. 2021) (applying the *Hunt* test to affirm district court's conclusions that plaintiffs alleged sufficient, particularized harm to warrant jurisdiction and individual participation was not necessary to warrant relief).

The Supreme Court's decision in *International Union, United Auto., Workers of America v. Brock*, 477 U.S. 274, 281–82 (1986), makes it clear why associational standing is appropriate here:

> It has long been settled that "[e]ven in the absence of injury
> to itself, an association may have standing solely as the

54

representative of its members. *E.g., National Motor Freight Assn. v. United States,* 372 U.S. 246 (1963)." *Warth v. Seldin,* 422 U.S. 490, 511 (1975). While the "possibility of such representational standing ... does not eliminate or attenuate the constitutional requirement of a case or controversy," *ibid.*; see *Sierra Club v. Morton,* 405 U.S. 727 (1972), we have found that, under certain circumstances, injury to an organization's members will satisfy Article III and allow that organization to litigate in federal court on their behalf. See *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 40 (1976). In *Warth, supra,* we set out the nature of these circumstances:

> "The association must allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit.... So long as this can be established, and so long as the nature of the claim and of the relief sought does not make the individual participation of each injured party indispensable to proper resolution of the cause, the association may be an appropriate representative of its members, entitled to invoke the court's jurisdiction." *Id.,* 422 U.S., at 511.

*International Union, United Auto., Aerospace and Agr. Implement Workers of America v. Brock*, 477 U.S. 274, 281–82 (1986). Later in this opinion the Court stated:

> The doctrine of associational standing recognizes that the primary reason people join an organization is often to create an effective vehicle for vindicating interests that they share with others. "The only practical judicial policy when people pool their capital, their interests, or their activities under a name and form that will identify collective interests, often is to permit the association or corporation in a single case to vindicate the interests of all." *Joint Anti-Fascist Refugee Committee v. McGrath,* 341 U.S. 123, 187, 71 S.Ct. 624,

> 656 (1951) (Jackson, J., concurring); see *NAACP v. Alabama ex rel. Patterson,* 357 U.S. 449, 459 (1958) (association "is but the medium through which its individual members seek to make more effective the expression of their views"). The very forces that cause individuals to band together in an association will thus provide some guarantee that the association will work to promote their interests.

*International Union, United Auto., Aerospace and Agr. Implement Workers of America v. Brock*, *supra* at 290 (1986).

Very clearly, NYCC has associational standing to pursue a claim that without more Court Interpreters in the court system non-English speaking will be unconstitutionally denied equal access to the Courts, and its belief, along with the individual plaintiffs, that higher pay is the key element of achieving that goal. NYCC has standing to pursue this lawsuit.

### POINT II

### THE INDIVIDUAL PLAINTIFFS' ALLEGATIONS SUFFICIENTLY PLEAD AN EQUAL PROTECTION CLAIM BASED ON NATIONAL ORIGIN

Appellants, the vast majority of whom are persons of non-Anglo national origins, and all of whom associate with persons of non-Anglo national origin assert that Defendants/Appellants have violated the Equal Protection Clause of the Fourteenth Amendment by enforcing an unfair pay structure for court interpreters.

Public employees who are subjected to discrimination based on national origin are protected by the Equal Protection clause. *See Vill. of Freeport v.*

*Barrella*, 814 F.3d 594, 604–05 (2d Cir. 2016). Policies that impact national ancestry and ethnic origin are subject to strict scrutiny. *See Korematsu v. United States,* 323 U.S. 214, 216 (1944) (national ancestry and ethnic origin subject to strict scrutiny). Despite societal confusion regarding Hispanic identity, the existence of a Hispanic "race" has long been settled with respect to § 1981. Although that statute never uses the word "race," the Supreme Court has construed it as forbidding "racial" discrimination in public or private employment. *Saint Francis Coll. v. Al–Khazraji,* 481 U.S. 604, 609, 613 (1987) The Court has further defined "racial discrimination," for purposes of § 1981, as including discrimination based on "ancestry or ethnic characteristics." *Id*. And see *Vill. of Freeport v. Barrell*a, 814 F.3d 594, 604–05 (2d Cir. 2016).

Appellants understand that to state a discrimination claim under the Fourteenth Amendment Equal Protection Clause and/or § 1981, plaintiffs must sufficiently allege that Defendants/Appellants acted with discriminatory intent. *Gen. Bldg. Contractors Ass'n v. Pennsylvania,* 458 U.S. 375, 391, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982). To defeat a motion to dismiss, a plaintiff asserting a federal race discrimination claim "must plausibly allege that (1) the employer took adverse action against him, and (2) his race, color, religion, sex, or national origin was a motivating factor in the employment decision." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 87 (2d Cir. 2015). A plaintiff may meet the second

requirement "by alleging facts that directly show discrimination or facts that indirectly show discrimination by giving rise to a plausible inference of discrimination." *Id.*

The Second Amended Complaint makes both anecdotal allegations of hostility towards Court Interpreters (including one judge calling Court Interpreters "chattel," and statistical evidence which in extensive detail explains why Court Interpreters are more highly qualified that the comparators, which are most extensively discussed as Court Reporters, and less extensively as Court Clerks, how the employees in those two titles are significantly better paid in the New York State Court system, and a largely white, and not employees of non-US nationalities. The pleading also discusses how in the Federal Court system Court Interpreters are better paid than the titles which are better paid in the NY State Court system, which are largely populated by English speaking natives.

Plaintiffs also, very clearly denote Court Reporters, and Court Reporters who are a majority white, English speaking employees, as their comparators.

The issue here is whether the allegations of the Complaint, in making that comparison, which are principally statistical, create a sufficient *inference* of discrimination to withstand a Motion to Dismiss. The Second Circuit addressed this issue at length in *Burgis v. New York City Dept. of Sanitation*, 798 F.3d 63, 68-70 (2nd Cir. 2015):

Plaintiffs argue, however, that statistics alone may be sufficient to warrant a plausible inference of discriminatory intent if they show a pattern or practice that cannot be explained except on the basis of intentional discrimination. This is an issue of first impression for this Circuit in the context of a putative class action alleging employment discrimination under § 1981 and/or the Equal Protection Clause. We now hold that, as some of our Title VII cases have hinted, *in certain circumstances* (described below), *statistics alone may be sufficient. Cf. United States v. City of New York,* 717 F.3d 72, 84 (2d Cir.2013) (noting that while, in a Title VII disparate treatment pattern or practice case, "instances of discrimination against particular employees are relevant to show a policy of intentional discrimination, they are not required; a statistical showing of disparate impact might suffice"); *see also Hudson v. Int'l Bus. Machines Corp.,* 620 F.2d 351, 355 (2d Cir.1980) (stating, in a case preceding *Iqbal,* that "in class actions alleging racially discriminatory employment practices, statistical evidence may establish a prima facie case of discriminatory effect"). However, to show discriminatory intent in a § 1981 or Equal Protection case based on statistics alone, the statistics must not only be statistically significant in the mathematical sense, but they must also be of a level that makes other plausible non-discriminatory explanations very unlikely. *Cf. Hazelwood Sch. Dist. v. United States,* 433 U.S. 299, 307–08, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977) (holding that to "constitute prima facie proof of a pattern or practice of discrimination," a plaintiff must show "gross statistical disparities"); *Ottaviani v. State Univ. of New York at New Paltz,* 875 F.2d 365, 371 (2d Cir. 1989) ("The threshold question in [Title VII pattern-or-practice] disparate treatment cases, then, is: 'At *what point* is the disparity in selection rates sufficiently large, or the probability that chance was the cause sufficiently *low,* for the numbers alone to establish a legitimate inference of discrimination?'" (quoting *Palmer v. Shultz,* 815 F.2d 84, 92 (D.C. Cir. 1987) (alterations omitted).

The Second Circuit then explained why the statistical evidence was insufficient in *Burgis*:

> In the instant case, plaintiffs have failed to allege statistics that meet the standards articulated above. Among other shortcomings, the statistics provided by plaintiffs show only the raw percentages of White, Black, and Hispanic individuals at each employment level, without providing any detail as to the number of individuals at each level, the qualifications of individuals in the applicant pool and of those hired for each position, or the number of openings at each level. *See Lomotey v. CT Dep't of Transp.,* 355 Fed.Appx. 478, 481 (2d Cir. 2009) (summary order) ("[Plaintiff's] evidence that only Caucasians were selected for [job] placements amounts to nothing more than raw numbers which, without further information on key considerations such as the racial composition of the qualified labor pool, cannot support an inference of discrimination.").

*Id.*

We submit that the statistical evidence presented in this case is far more compelling, especially at this stage of the litigation. Court Interpreters are described as being <u>entirely</u> persons who were either of non-Anglo national origin, or who associated with persons of non-Anglos national origin. The same is not true of Court Reporters or Court Clerks. In *Burgis,* the statistical evidence was that the percentage of entry level minorities was far larger than those promoted to higher level jobs, and that the percentage of minorities got smaller the higher up the chain one went. But some minorities were promoted, and the statistics did not demonstrate the percentages of non-white and white employees applied. In this

60

case the entire group of protected class members is shown to be better qualified than another group which is not all in the protected class, but are paid less. So, at this point we have class-based discrimination which has no other known potential explanation other than discriminatory intent based on national origin, or association with persons of non-Anglo national origin. Therefore, this case is more like *Richardson v. City of New York*, 2018 WL 4682224, at *7 (S.D.N.Y. 2018), where the Court said:

> Plaintiffs' hiring and job-placement claims satisfy the standard required to survive a motion to dismiss. To be sure, no one of Plaintiffs' allegations constitutes a smoking gun, nor does the complaint taken as a whole compel the conclusion that the City has exhibited a practice of intentional racial discrimination in deciding whom to hire or promote into which positions. But Plaintiffs need not prove their case at this stage. Indeed, they need not even make out a prima facie case of discrimination. *See Barbosa*, 716 F. Supp. 2d at 215. Instead, they need only "raise a reasonable expectation that discovery will reveal evidence of illegal[ity]." *Arista Records*, 604 F.3d at 120 (alteration in original) (quoting *Twombly*, 550 U.S. at 556). Plaintiffs have done so. Most critically, their statistical evidence is compelling. Unlike in *Burgis v. New York City Department of Sanitation*, 798 F.3d 63 (2d Cir. 2015), upon which the City relies, Plaintiffs have done more than produce **"only the raw percentages of [white and black] individuals at each employment level,"** *id.* at 70. Rather, in addition to those raw numbers, Plaintiffs have shown that African Americans are underrepresented at FDNY.

(Emphasis in the original.)

We submit that this case is far more like *Richardson* than *Burgis*, that the claims are *plausible*, and that at his stage discovery should be allowed to examine the reasons why the Defendants/Appellants insists on paying the low level of pay it pays to Court Interpreters, even after acknowledging that the low levels of pay was leading to a dearth of people taking the NY State Court interpreter exam, and that the pay of New York Interpreters was below that of neighboring jurisdictions. See memo of Justin Barry to District Executive Chief Clerks, dated November 1, 2023. (JA 213-214).

The District Court erred here when it found that the Second Amended Complaint did not even state a "plausible" claim. "The plausibility standard is not akin to a probability requirement...." *Id.* (internal quotation marks omitted). "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable, and that a recovery is very remote and unlikely." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 556, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). The Second Amended Complaint, which sets out considerable detail, and speaks to the impact of pay practices on an entire class of Court employees, **all** of whom are either of a non-US national origin, or who associate with and assist others of a non-US national origin who speak languages other than English, is not a case like *Burgis,* where there was no comparator information. This case should proceed to discovery, and hopefully, resolution.

## **CONCLUSION**

For the reasons stated hereinabove, the Decision of the District Court should be reversed on the issue of NYCC's standing, and on the question of whether Plaintiff/Appellants stated a claim.

Dated: New York, New York
        January 6, 2025

                                ADVOCATES FOR JUSTICE,
                                CHARTERED ATTORNEYS
                                Attorneys for Appellants

                                By: /s/ *Arthur Z. Schwartz*
                                    Arthur Z. Schwartz (AZS 2683)
                                225 Broadway, Suite 1902
                                New York, New York 10007
                                212-285-1400
                                aschwartz@afjlaw.com

## <u>CERTIFICATE OF COMPLIANCE</u>

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B), because: excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 12,072 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because: this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point font Times New Roman.

Dated: New York, New York
     January 6, 2025

ADVOCATES FOR JUSTICE,
CHARTERED ATTORNEYS
Attorneys for Appellant

By: /s/ *Arthur Z. Schwartz*
    Arthur Z. Schwartz (AZS 2683)
225 Broadway, Suite 1902
New York, New York 10007
917-923-8136
aschwartz@afjlaw.com