# 24-2434

## United States Court of Appeals for the Second Circuit

LINDA BERGNES, on behalf of themselves and classes similarly situated,
MANUEL CARVAJAL, on behalf of themselves and classes similarly situated,
ROBERTO ISAZA, on behalf of themselves and classes similarly situated,

*Plaintiffs-Appellants,*

v.

JOSEPH A. ZAYAS, CAROLYN GRIMALDI,

*Defendants-Appellees,*

NEW YORK STATE UNIFIED COURT SYSTEM,
OFFICE OF COURT ADMINISTRATION,

*Defendant.*

*(caption continues inside front cover)*

On Appeal from the United States District Court
for the Southern District of New York

## BRIEF FOR APPELLEES

BARBARA D. UNDERWOOD
  *Solicitor General*
MATTHEW WILLIAM GRIECO
  *Senior Assistant Solicitor General*
DANIEL S. MAGY
  *Assistant Solicitor General*
    *of Counsel*

LETITIA JAMES
  *Attorney General*
  *State of New York*
Attorney for Appellees
28 Liberty Street
New York, New York 10005
(212) 416-6073

Dated: March 10, 2025

*(caption continues from front cover)*

GUADALUPE ORNELAS, on behalf of themselves and classes similarly situated,
HECTOR TOMASI, on behalf of themselves and classes similarly situated,
TERESA VENDITTO, on behalf of themselves and classes similarly situated,
GUADALUPE ALVAREZ, on behalf of themselves and classes similarly situated,
CARLOS COLLAZO, on behalf of themselves and classes similarly situated,
MARISOL CORNIELLE, on behalf of themselves and classes similarly situated,
RAFAEL FORTICH, on behalf of themselves and classes similarly situated,
LAURA GONZALEZ, on behalf of themselves and classes similarly situated,
HOE YEN LEE, on behalf of themselves and classes similarly situated,
ARNOLD S. LEMUS, on behalf of themselves and classes similarly situated,
RONALD E. LOPEZ, on behalf of themselves and classes similarly situated,
JULIO LUCERO, on behalf of themselves and classes similarly situated,
LUIS R. LUGO, on behalf of themselves and classes similarly situated,
EDWARD C. LUK, on behalf of themselves and classes similarly situated,
WANDA NEGRON, on behalf of themselves and classes similarly situated,
DAVID B. OLSON, on behalf of themselves and classes similarly situated,
OSCAR ORE, on behalf of themselves and classes similarly situated,
SANDY RAND, on behalf of themselves and classes similarly situated,
JULIO ROSA, on behalf of themselves and classes similarly situated,
ALEKSANDRA SAGAN, on behalf of themselves and classes similarly situated,
GLENYS SALDANA, on behalf of themselves and classes similarly situated,
YANET SANTIAGO, on behalf of themselves and classes similarly situated,
MICHAEL SOFRONAS, on behalf of themselves and classes similarly situated,
CYNTHIA VIAU, on behalf of themselves and classes similarly situated,
JOSE ORIZ ESCOBAR, on behalf of themselves and classes similarly situated,
NEW YORK COMMUNITIES FOR CHANGE, on behalf of Spanish and other
Foreign Language Speaking Court Users and Potential Court Users,

*Plaintiffs-Appellants.*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................iii

PRELIMINARY STATEMENT ................................................. 1

ISSUES PRESENTED ................................................................ 3

STATEMENT OF THE CASE ................................................. 3

    A.   Factual Background ................................................. 3

    B.   Procedural History ................................................. 8

        1.   Plaintiffs' complaint ........................................... 8

        2.   The district court's dismissal order ................... 9

SUMMARY OF ARGUMENT .................................................. 11

ARGUMENT ............................................................................. 13

POINT I

NEW YORK COMMUNITIES FOR CHANGE LACKS STANDING.................... 13

    A.   Organizations Do Not Have Standing to Sue on Behalf of Their Members in § 1983 Actions. ..................................... 13

    B.   In Any Event, New York Communities for Change Failed to Show That Its Members Would Have Standing to Sue on Their Own. ............................................. 15

POINT II

PLAINTIFFS FAIL TO STATE A PLAUSIBLE CLAIM FOR NATIONAL ORIGIN DISCRIMINATION ..................................................... 17

i

**Page**

A.   The Complaint's Comparisons Between Court Interpreters and Court Reporters Do Not Raise a Plausible Inference of Discriminatory Intent..........................20

B.   The Complaint's Other Allegations Do Not Raise a Plausible Inference of Discriminatory Intent..........................25

CONCLUSION .......................................................................28

# TABLE OF AUTHORITIES

**Cases**                                                    **Page(s)**

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ................................................................ 19

*Brown v. Daikin Am. Inc.,*
    756 F.3d 219 (2d Cir. 2014) ............................................... 21

*Buon v. Spindler,*
    65 F.4th 64 (2d Cir. 2023) .................................................. 19

*Burgis v. New York City Dep't of Sanitation,*
    798 F.3d 63 (2d Cir. 2015) ................................... 18, 23, 25

*Connecticut Citizens Def. League, Inc. v. Lamont,*
    6 F.4th 439 (2d Cir. 2021) ............................................. 14-15

*Connick v. Thompson,*
    563 U.S. 51 (2011) ................................................................ 26

*Denney v. Deutsche Bank AG,*
    443 F.3d 253 (2d Cir. 2006) ............................................... 13

*E.E.O.C. v. Port Auth. of N.Y. & N.J.,*
    768 F.3d 247 (2d Cir. 2014) ............................................... 21

*Ex parte Young,*
    209 U.S. 123 (1908) .............................................................. 27

*Faculty v. New York Univ.,*
    11 F.4th 68 (2d Cir. 2021) .................................................. 13

*Hafer v. Melo,*
    502 U.S. 21 (1991) ........................................................ 18, 26

*Hayden v. County of Nassau,*
    180 F.3d 42 (2d Cir. 1999) ................................................. 18

iii

**Cases**                                                     **Page(s)**

*Henrietta D. v. Bloomberg,*
   331 F.3d 261 (2d Cir. 2003) ........................................................ 18

*Irish Lesbian & Gay Org. v. Giuliani,*
   143 F.3d 638 (2d Cir. 1998) ........................................................ 13

*Jones v. Town of E. Haven,*
   691 F.3d 72 (2d Cir. 2012) .......................................................... 26

*League of Women Voters of Nassau Cnty. v. Nassau Cnty.*
   *Bd. of Supervisors,*
   737 F.2d 155 (2d Cir. 1984) ........................................................ 14

*Lenzi v. Systemax, Inc.,*
   944 F.3d 97 (2d Cir. 2019) .......................................................... 21

*Lewis v. Clarke,*
   581 U.S. 155 (2017) ...................................................................... 17

*Littlejohn v. City of New York,*
   795 F.3d 297 (2d Cir. 2015) ........................................................ 19

*Lujan v. Defenders of Wildlife,*
   504 U.S. 555 (1992) ...................................................................... 16

*Mendez v. Heller,*
   530 F.2d 457 (2d Cir. 1976) ........................................................ 27

*Moya v. United States Dep't of Homeland Sec.,*
   975 F.3d 120 (2d Cir. 2020) ........................................................ 14

*Nnebe v. Daus,*
   644 F.3d 147 (2d Cir. 2011) ........................................................ 14

*Norville v. Staten Island Univ. Hosp.,*
   196 F.3d 89 (2d Cir. 1999) .......................................................... 20

iv

**Cases**                                                                    **Page(s)**

*Pattanayak v. Mastercard Inc.*,
    No. 22-1411, 2023 WL 2358826 (2d Cir. Mar. 6, 2023)......................21

*Personnel Adm'r of Mass. v. Feeney*,
    442 U.S. 256 (1979)...............................................................................19

*Richardson v. City of New York*,
    No. 17-cv-9447, 2018 WL 4682224 (S.D.N.Y. Sept. 28, 2018) ..........24

*Smith v. Martuscello*,
    602 F. App'x 550 (2d Cir. 2015) ....................................................18, 26

*Steinberg v. Elkman*,
    666 F. App'x 26 (2d Cir. 2016) ..........................................................27

*Stinnett v. Delta Air Lines, Inc.*,
    803 F. App'x 505 (2d Cir. 2020) .........................................................21

*United Food & Com. Workers Union Loc. 751 v. Brown*
    *Grp., Inc.*,
    517 U.S. 544 (1996)...............................................................................16

*Vega v. Hempstead Union Free Sch. Dist.*,
    801 F.3d 72 (2d Cir. 2015) ...................................................................19

*Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*,
    429 U.S. 252 (1977)...............................................................................18

*Webb v. Goord*,
    340 F.3d 105 (2d Cir. 2003) .................................................................26

**Regulation**

22 N.Y.C.R.R.
    § 217.1 ...................................................................................................16
    § 217.2 ...................................................................................................16

## PRELIMINARY STATEMENT

In this action under 42 U.S.C. § 1983, plaintiffs allege that defendants—the Chief Administrative Judge and the Human Resources Director of the New York State Unified Court System (UCS)—engage in national origin discrimination by paying court interpreters less than other nonjudicial employees. Plaintiffs are twenty-nine UCS court interpreters and an organization, New York Communities for Change (NYCC). Plaintiffs do not allege any direct evidence showing that defendants have intentionally discriminated against court interpreters. Instead, plaintiffs primarily allege that they have raised an inference of national origin discrimination at the motion-to-dismiss stage because court interpreters are paid less other UCS employees and, unlike the other UCS employees, are "largely of non-United States national origin." (J.A. 73.) Plaintiffs seek an injunction ordering defendants to raise the salaries of court interpreters.

Concluding that NYCC lacked Article III standing and that plaintiffs failed to plausibly allege that defendants acted with discriminatory intent, the United States District Court for the Southern District of New York (Abrams, J.) dismissed the complaint.

This Court should affirm. *First*, NYCC lacks Article III standing. In an action brought under § 1983, an organization does not have standing to assert its members' rights but instead must show that the organization itself suffered an injury. Here, NYCC does not allege that it has suffered any injuries.

*Second*, plaintiffs' discrimination claim fails because plaintiffs do not plausibly allege that defendants acted with discriminatory intent in setting the salary of court interpreters. Plaintiffs acknowledge that their allegations of discriminatory intent are primarily based on statistical allegations comparing the pay of court interpreters to court reporters. These comparisons do not raise an inference of discriminatory intent because the job of a court interpreter is materially different from the job of a court reporter, and court reporters therefore are not a similarly situated comparator group. And even if the jobs were sufficiently similar, the comparison would still fail because plaintiffs' statistics are vague, highly generalized, and conclusory. Plaintiffs' anecdotal allegations of mistreatment against court interpreters fail to bridge the gap because plaintiffs do not connect any of these allegations to decisions regarding their pay.

## ISSUES PRESENTED

1. Whether NYCC has Article III standing to bring this § 1983 action where it failed to allege an injury to the organization itself.

2. Whether plaintiffs failed to state a claim for national origin discrimination under § 1983 where plaintiffs failed to adequately allege that defendants acted with discriminatory intent.

## STATEMENT OF THE CASE

### A. Factual Background[1]

Plaintiffs are NYCC and twenty-nine court interpreters. (J.A. 73-80.) NYCC is a nonprofit organization "engaged in housing, climate justice, civil rights, and employment organizing." (J.A. 73.) It works primarily in "the Spanish-speaking community and a large number of its members are Spanish speakers." (J.A. 73.) The interpreter plaintiffs are employed by the UCS, which employs approximately 246 full- and part-time court interpreters in twenty foreign languages and American Sign

---

[1] This factual background is based on the allegations in the complaint, which defendants accept as true only for purposes of this appeal from a dismissal under Federal Rule of Civil Procedure 12(b)(6).

Language.[2] (J.A. 84, 129.) Twenty-two interpreter plaintiffs identify as being of Hispanic national origin, two identify as being of Chinese national origin, one identifies as being of Haitian and Dominican national origin, and one identifies as being of Polish national origin. The complaint does not allege national origins for three interpreter plaintiffs. Twenty-eight interpreter plaintiffs interpret for individuals who speak a foreign language (Spanish, Mandarin, Cantonese, or Polish), and one interprets for deaf individuals. (J.A. 74-80.)

Defendants are Joseph A. Zayas, the Chief Administrative Judge of the UCS, and Carolyn Grimaldi, the Director of the Department of Human Resources for the Office of Court Administration, which is the administrative arm of the UCS. (J.A. 80.) As Chief Administrative Judge, Judge Zayas "oversees the day-to-day operation of the Statewide Court system, including its $3.3 billion budget, 3,330 state and local judges, and 15,000 nonjudicial employees in over 300 locations across the state."

---

[2] To support this allegation, the complaint cites a publicly available UCS report from March 2017, which is attached to the complaint as an exhibit. (*See* J.A. 84, 114.) The page from the report that the complaint cites states that the UCS employs "more than 300 . . . court interpreters," not 246. (J.A. 129.)

(J.A. 80.) The complaint does not allege any of Grimaldi's responsibilities as Director of the Department of Human Resources for the Office of Court Administration.

The claims in the complaint relate to the salary classifications that the UCS assigns to certain nonjudicial employees. Plaintiffs allege that the UCS hires court interpreters at the JG-18 classification, which equates to a salary range of $60,245 to $85,886.[3] (J.A. 86, 91.) The UCS hires court reporters at the JG-24 classification, which equates to a salary range of $81,254 to $131,923. (J.A. 86, 91.) The UCS hires court officers at the JG-19 classification, which equates to a salary range of $63,245 to $90,160. (J.A. 86, 88.) The complaint does not allege the classification of court clerks but alleges that they are paid at a range of $69,852 to $99,057. (J.A. 86.) The complaint also compares these salary ranges to those offered for equivalent titles in federal court. (J.A. 85-86.) Federal court interpreters, for example, are paid at a salary range of $120,580 to

_____

[3] In a declaration submitted by plaintiffs below, plaintiffs attached an internal UCS memorandum, dated November 1, 2023, which states that court interpreters were being reallocated from the JG-18 classification to the JG-20 classification. (J.A. 213.) According to the memo, the reallocation "realigns compensation in [the court interpreter] title to that offered in other states in the region." (J.A. 213.)

$156,758, while federal court reporters are paid at a range of $91,511 to $105,237. (J.A. 86.)

The complaint alleges that the UCS salary classification for court interpreters—which results in interpreters receiving pay on a lower scale than court reporters, court officers, and court clerks—is discriminatory because it is based on their national origins. To support their allegations, plaintiffs primarily rely on comparisons to court reporters, whom the complaint alleges are the "closest group of professional employees to" court interpreters. (J.A. 86.) According to the complaint, UCS court interpreters are "largely foreign born" (J.A. 92), while UCS court reporters are "mainly people who are not foreign born" (J.A. 86). The complaint alleges that court interpreting and court reporting share "similarities in the nature of the job and skills required" (J.A. 86), but that UCS pays court interpreters "significantly less" than court reporters, a disparity that plaintiffs attribute to national origin discrimination. (J.A. 73.)

But the complaint also acknowledges that court interpreters perform different roles than court reporters. Court interpreters are responsible for interpreting between English and a foreign language in court proceedings for non-English-speaking litigants. (J.A. 87.) Court reporters, by

6

contrast, are responsible for the verbatim recording and transcription of testimony. (*See* J.A. 87, 91.) Because the jobs are different, the complaint also acknowledges that they require different qualifications. (J.A. 91-92.) Although neither role requires a college degree, court reporters must have three years of "general verbatim reporting experience" or graduation from a formal program in court reporting and two years of experience. (J.A. 91.) Court interpreters do not have an equivalent experience requirement. And although both jobs require applicants to pass a civil service exam, the exams test different skills given the distinct functions of each job. (*See* J.A. 92, 96-97.)

The complaint also alleges that some UCS employees—but not defendants—have exhibited a "discriminatory attitude" toward court interpreters and subjected them to demeaning treatment. (J.A. 109-110.) Plaintiffs do not specify whether they personally have been subjected to this alleged mistreatment or whether they are aware of it from other sources. Plaintiffs do not allege that defendants (or any of their predecessors) played any role in the alleged mistreatment or were aware of it. Plaintiffs also do not allege that defendants, or any UCS employees responsible for salary decisions, have ever subjected court interpreters to

7

any mistreatment or exhibited any discriminatory attitudes toward court interpreters.

## B.  Procedural History

### 1.  Plaintiffs' complaint

Plaintiffs filed this action in May 2022 and filed a first amended complaint in October 2022. (J.A. 5, 16.) Plaintiffs' first amended complaint named only the UCS as a defendant. (J.A. 24.) It asserted claims under state and federal law and sought equitable relief, lost wages, and other damages. (J.A. 55-57.)

The district court dismissed the first amended complaint on the ground that it was barred by sovereign immunity because the UCS is an arm of the State. (J.A. 61, 68.)

Following that decision, plaintiffs filed a second amended complaint, which removes the UCS as a defendant and instead names Judge Zayas and Grimaldi as defendants. (J.A. 80.) The second amended complaint asserts two claims under 42 U.S.C. § 1983 for violation of the Equal Protection Clause of the Fourteenth Amendment. The first claim asserts that defendants have violated the Equal Protection Clause with respect to the interpreter plaintiffs, and the second claim asserts that

defendants have violated the Equal Protection Clause with respect to NYCC's members, "non-English speaking persons who utilize" the UCS. (J.A. 112.) The interpreter plaintiffs bring their claim on behalf of themselves and a proposed class of "all full or part-time persons employed by the UCS as Interpreters for the three years prior to the filing of the Complaint." (J.A. 80.)

Unlike the first amended complaint, the second amended complaint does not seek lost wages or other damages. It seeks only (i) a declaratory judgment that defendants have violated the Equal Protection Clause by unlawfully paying court interpreters based on national origin, and (ii) an injunction directing defendants "to adjust the salaries" of the interpreter plaintiffs "to a pay level commensurate with the knowledge, skills, and abilities which they bring to the job." (J.A. 112-113.)

## 2. The district court's dismissal order

In January 2025, the district court issued an opinion and order dismissing the second amended complaint. (J.A. 217-240.)

The court first dismissed NYCC's claims for lack of Article III standing. The court held that, under Second Circuit precedent, NYCC lacked standing to bring an action under § 1983 on behalf of its members.

9

Although NYCC would have standing to bring a claim on its own behalf, it failed to allege that defendants had caused the organization any injury sufficient for standing. (J.A. 231-234.)

The court next dismissed the claims of the interpreter plaintiffs for failure to state a claim for national origin discrimination under § 1983. (J.A. 234-240.) The court held that plaintiffs had failed to allege that court interpreters were similarly situated in all material respects to court reporters, and they therefore could not show that defendants' decision to pay court interpreters less than court reporters was discriminatory. The court explained that, according to the complaint itself, court interpreters and court reporters perform different tasks, possess different qualifications and skills, and have different experience requirements. (J.A. 235-237.)

The court also held that, even if court interpreters were materially similar to court reporters, plaintiffs had failed to allege that defendants' decisions regarding the pay of court interpreters gave rise to an inference of discriminatory intent. (J.A. 237-240.) The court held that the complaint's statistical allegations were insufficient because they were vague and conclusory. (J.A. 238.) Plaintiffs alleged that the "majority" of plaintiffs

10

employed by UCS are "persons of non-Anglo national origin," while court reporters are "mainly people who are not foreign-born." (J.A. 238.) But aside from these generalities, plaintiffs did not present any "concrete statistics about court interpreters or any comparator group—either in percentages or numbers." (J.A. 238.) The court also held that plaintiffs' anecdotal allegations regarding hostility toward court interpreters were insufficient because plaintiffs failed to allege that defendants played any role in the alleged mistreatment or had any knowledge of it.[4] (J.A. 239.)

## SUMMARY OF ARGUMENT

This Court should affirm the district court's dismissal of the second amended complaint.

I. NYCC lacks Article III standing to bring this lawsuit. Under established circuit precedent that NYCC does not address, an organization has standing to sue under § 1983 only if it can show that the organization itself suffered an injury. Organizations do not have standing to bring

---

[4] The district court also held that: (1) because the plaintiffs' claims sought only prospective, injunctive relief, the claims were not barred by sovereign immunity; and (2) the case should not be dismissed or stayed under the *Colorado River* abstention doctrine. (J.A. 222-231.)

§ 1983 claims on behalf of their members. Here, the complaint concedes that NYCC is bringing this action only on behalf of its members and does not allege that NYCC itself has been harmed.

II.     The interpreter plaintiffs failed to state a claim for national origin discrimination because they do not plausibly allege that defendants acted with discriminatory intent in setting the salaries of court reporters. Plaintiffs' statistical allegations comparing the pay of court interpreters with the pay of court reporters do not state a plausible claim because court interpreters and court reporters perform substantially different jobs. In any event, even if the jobs were similar, plaintiffs' comparisons still fail to state a claim because their "statistical evidence" is vague and conclusory. Plaintiffs' allegations that court interpreters have been mistreated by some UCS employees are insufficient because they fail to connect these allegations to defendants or to any salary decisions.

# ARGUMENT

## POINT I

### NEW YORK COMMUNITIES FOR CHANGE LACKS STANDING

**A.    Organizations Do Not Have Standing to Sue on Behalf of Their Members in § 1983 Actions.**

Article III standing is "the threshold question in every federal case, determining the power of the court to entertain the suit." *Denney v. Deutsche Bank AG*, 443 F.3d 253, 263 (2d Cir. 2006) (quotation marks omitted). To have Article III standing, "a plaintiff must have suffered an injury in fact that is distinct and palpable; the injury must be fairly traceable to the challenged action; and the injury must be likely redressable by a favorable decision." *Id.* (quotation marks omitted).

In general, an organization can establish Article III standing in either of two ways. *See Irish Lesbian & Gay Org. v. Giuliani*, 143 F.3d 638, 649 (2d Cir. 1998). The organization can show that its members were injured and seek to sue on their behalf (associational standing), *see Faculty v. New York Univ.*, 11 F.4th 68, 75 (2d Cir. 2021), or that the organization suffered an injury independent of its members and seek to sue on its own behalf (organizational standing), *see id.* & n.27.

13

However, the rights secured by § 1983 are "personal to those purportedly injured." *League of Women Voters of Nassau Cnty. v. Nassau Cnty. Bd. of Supervisors*, 737 F.2d 155, 160 (2d Cir. 1984). Accordingly, an organization does not have standing to assert its members' rights in a § 1983 action. *Nnebe v. Daus*, 644 F.3d 147, 156 (2d Cir. 2011); *see also Connecticut Citizens Def. League, Inc. v. Lamont*, 6 F.4th 439, 447 (2d Cir. 2021). Instead, an organization has standing to bring a § 1983 action only if the organization can independently satisfy the Article III standing requirements, including by showing injury to the organization itself. *See Nnebe*, 644 F.3d at 156; *see, e.g.*, *Moya v. United States Dep't of Homeland Sec.*, 975 F.3d 120, 129 (2d Cir. 2020).

The district court, in holding that NYCC lacks standing, correctly applied these precedents. (*See* J.A. 232-234.) NYCC does not allege that it has suffered an injury. NYCC does not allege, for example, that defendants' conduct has impaired its activities, caused it to expend any resources, frustrated its mission, or increased demands for its services. *Cf., e.g.*, *Moya*, 975 F.3d at 129. Instead, the complaint specifically alleges that NYCC brought its claims only "on behalf of its members" (J.A. 73)

14

and asserts only that NYCC's members—not NYCC itself—have been injured by defendants' alleged conduct (*See* J.A. 102-109).

In its brief to this Court, NYCC fails to address the relevant precedents upon which the district court relied, including *Nnebe* and *Moya*, and does not argue that it has suffered any independent injuries sufficient for standing. Instead, NYCC maintains that it can sue on behalf of its members even if it has not itself been injured. *See* Br. at 52. That argument is foreclosed by the precedents that NYCC fails to address. Furthermore, there is no merit to NYCC's suggestion (Br. at 51) that the limitation on organizational standing in § 1983 actions does not apply to claims seeking injunctions. The Court has applied the limitation to § 1983 actions seeking injunctive relief. *See, e.g.*, *Connecticut Citizens Def. League, Inc.*, 6 F.4th at 447.

## B. In Any Event, New York Communities for Change Failed to Show That Its Members Would Have Standing to Sue on Their Own.

Even if this Court's precedents permitted an organization to assert its members' rights under § 1983, NYCC's allegations in this case would fail to support standing. An organization has standing to sue on behalf of its members only where it can show, among other things, that the

members "would have had standing to sue on their own." *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 553 (1996). Here, NYCC's members would not have standing because they would fail to satisfy, at a minimum, redressability.

Unlike the individual named plaintiffs, NYCC's members are not court interpreters. Rather, they are non-English-speaking individuals who NYCC claims have been denied "equal access" to the courts because they are not "being served by the most qualified [i]nterpreters." (J.A. 89.) Even if NYCC's members could establish that they have suffered a sufficiently concrete injury under Article III, they would fail to show that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (quotation marks omitted). The complaint seeks only an injunction raising the pay of court interpreters; it does not ask the Court to order defendants to hire more interpreters, raise the hiring qualifications of interpreters, or provide interpreters in more cases.

Moreover, as the complaint acknowledges (J.A. 103), the UCS already provides a free court interpreter in both criminal and civil matters to any participant who requires one. *See* 22 N.Y.C.R.R. §§ 217.1, 217.2.

16

NYCC does not allege that defendants have violated that requirement. Nor does NYCC allege that the court interpreters employed by the UCS are unqualified. NYCC can therefore only speculate that an injunction raising the pay of court interpreters would lead to its members being served by "the most qualified [i]nterpreters" or otherwise redress their alleged injuries. (*See* J.A. 89.)

## POINT II

### PLAINTIFFS FAIL TO STATE A PLAUSIBLE CLAIM FOR NATIONAL ORIGIN DISCRIMINATION

Although the interpreter plaintiffs have standing to pursue their claim for injunctive relief, the Court should affirm the district court's conclusion that they failed to state a plausible § 1983 claim for national origin discrimination.

Because plaintiffs seek injunctive relief against defendants in their official capacities, this suit is treated as a suit against the State.[5] *See*

---

[5] The complaint states that Judge Zayas and Grimaldi are being sued "as individuals" (J.A. 80), but the injunctive relief plaintiffs seek can only be obtained from defendants in their official capacities. This is therefore an official capacity suit, because the Court looks to the actual nature of the remedy sought, rather than the characterization of the parties in the complaint. *See Lewis v. Clarke*, 581 U.S. 155, 162 (2017).

*Hafer v. Melo*, 502 U.S. 21, 25 (1991) (citing *Kentucky v. Graham*, 473 U.S. 159, 166 (1985)); *Henrietta D. v. Bloomberg*, 331 F.3d 261, 288 (2d Cir. 2003). Because the real party in interest is the State, plaintiffs must show that a State "policy or custom . . . played a part in the violation of federal law." *Hafer*, 502 U.S. at 25 (quotation marks omitted); *accord Smith v. Martuscello*, 602 F. App'x 550, 551 (2d Cir. 2015).

Plaintiffs allege that defendants have violated § 1983 by engaging in national origin discrimination in setting the salaries of court interpreters. The Equal Protection Clause prohibits States from discriminating against individuals based on national origin. *See Hayden v. County of Nassau*, 180 F.3d 42, 48 (2d Cir. 1999). To establish a violation of equal protection, it is not enough for a plaintiff to show that a state action has a disproportionate impact on a protected class. *See Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977). The plaintiff must prove discriminatory intent or purpose. *See id.*; *Burgis v. New York City Dep't of Sanitation*, 798 F.3d 63, 68 (2d Cir. 2015).

At the pleading stage of an employment discrimination case under § 1983, a plaintiff must allege facts that give at least "minimal support"

for a showing that discriminatory intent motivated the employer's action.[6] *Buon v. Spindler*, 65 F.4th 64, 79 (2d Cir. 2023) (quotation marks omitted); *accord Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 87 (2d Cir. 2015). Discriminatory purpose is a motivating factor in a decision where "the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Personnel Adm'r of Mass. v. Feeney,* 442 U.S. 256, 279 (1979); *accord Ashcroft v. Iqbal*, 556 U.S. 662, 676-77 (2009).

On appeal, plaintiffs argue that they adequately alleged in two ways that defendants were motivated by discriminatory intent in setting the salaries of court interpreters: (1) by comparing the salaries of court interpreters and court reporters, (2) through "anecdotal allegations of hostility" by some UCS employees against court interpreters. *See* Br. at 58. The district court correctly concluded that these allegations do not raise a plausible inference that defendants acted with discriminatory

---

[6] If a case proceeds to summary judgment or trial, the court applies the *McDonnell Douglas* burden-shifting framework to determine whether a plaintiff has proven discrimination. *See Littlejohn v. City of New York*, 795 F.3d 297, 307-08 (2d Cir. 2015). That framework does not apply at the pleading stage. *See id.* at 311.

intent in setting the salaries of court interpreters, and this Court should therefore affirm.

## A. The Complaint's Comparisons Between Court Interpreters and Court Reporters Do Not Raise a Plausible Inference of Discriminatory Intent.

As the district court correctly concluded, the complaint's comparison between court interpreters and court reporters fails for two independent reasons. *First*, the complaint fails to plead that the job of court reporters is sufficiently similar to the job of court interpreters. (J.A. 235-237.) *Second*, and in any event, the allegations in the complaint, which plaintiffs concede are "principally statistical" (Br. at 58), fail to give rise to an inference of discriminatory intent (J.A. 237-239).

A plaintiff may establish an inference of national origin discrimination by showing that "similarly situated employees of a different [national origin] were treated more favorably." *Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 95 (2d Cir. 1999). To do so at the pleading stage, the plaintiff must allege that the employees are "similarly situated in all

material respects."[7] *Brown v. Daikin Am. Inc.*, 756 F.3d 219, 230 (2d Cir. 2014). In cases involving allegations of pay discrimination, this Court has held that employees are materially similar if their work is substantially the same. *See Lenzi v. Systemax, Inc.*, 944 F.3d 97, 109 (2d Cir. 2019) (citing *Belfi v. Prendergast*, 191 F.3d 129, 135, 139 (2d Cir. 1999)).

Here, plaintiffs have not pleaded that court interpreters perform substantially the same work as court reporters or that they are materially similar in any other way. To the contrary, as the district court found, the complaint highlights the many ways in which the two roles are dissimilar, including because court reporters and court interpreters do not share "work duties, educational requirements, or working conditions." (J.A. 237.)

---

[7] Although this Court has stated that whether employees are similarly situated "[o]rdinarily . . . presents a question of fact," *Brown*, 756 F.3d at 230 (quotation marks omitted), it has recognized that dismissal on this basis is proper where, as here, the face of the complaint shows that the employees are not similar. *See, e.g.*, *Pattanayak v. Mastercard Inc.*, No. 22-1411, 2023 WL 2358826, at *2 (2d Cir. Mar. 6, 2023) (summary order); *Stinnett v. Delta Air Lines, Inc.*, 803 F. App'x 505, 509 (2d Cir. 2020); *see also E.E.O.C. v. Port Auth. of N.Y. & N.J.*, 768 F.3d 247, 259 (2d Cir. 2014) (affirming dismissal of Equal Pay Act claim).

Specifically, the complaint acknowledges that court interpreters are responsible for interpreting between English and a foreign language in court proceedings for non-English-speaking litigants; court reporters, by contrast, are responsible for the verbatim recording and transcription of testimony. (*See* J.A. 87, 91.) Because the jobs are different, they also require different qualifications. (*See* J.A. 91-92.) Court reporters must have three years of "general verbatim reporting experience" or graduation from a formal program in court reporting and two years of experience. (J.A. 91.) Court interpreters do not have an equivalent experience requirement. And although both jobs require applicants to pass a civil service exam, the exams test different skills given the distinct functions of each job. (J.A. 92, 96-97.)

On appeal, plaintiffs do not dispute the district court's conclusion that they failed to allege that court reporters and court interpreters are similarly situated in all material respects.[8] Instead, they argue that they have adequately alleged discriminatory intent through statistics showing

---

[8] Indeed, at certain points in their brief and in the complaint, plaintiffs appear to concede that the work of court interpreters and the work of court reporters are "largely incomparable." *See* Br. at 21. (*See* J.A. 58.)

that defendants pay court interpreters less than court reporters because of their national origins. *See* Br. at 58. The district court correctly rejected this argument.

For statistics to support a plausible inference of discriminatory intent, they must "show a pattern or practice that cannot be explained except on the basis of intentional discrimination." *Burgis*, 798 F.3d at 69. To do so, "the statistics must not only be statistically significant in the mathematical sense, but they must also be of a level that makes other plausible non-discriminatory explanations very unlikely." *Id.* In *Burgis*, for example, the plaintiffs alleged that a New York City agency was passing qualified Black sanitation workers over for promotions in favor of less qualified White sanitation workers, and pointed to statistics showing the percentage of Black, White, and Hispanic employees at each level of the sanitation workforce. *Id.* at 66-67. The Court held that these allegations were insufficient because they provided only "raw percentages" of each group at each employment level. *Id.* at 70.

Plaintiffs' allegations here fail for the same reason. As in *Burgis*, the complaint does not actually provide any statistical analysis. Instead, plaintiffs only allege vaguely that court interpreters are mainly people

23

who are foreign-born (J.A. 73), while court reporters are mainly people who are not (J.A. 86). As the district court explained, the complaint provides "no concrete statistics about courtroom personnel broken down by national origin, ethnicity, race, ancestry, or otherwise." (J.A. 238.) Indeed, the allegations here fall short of even the allegations found insufficient in *Burgis*, as plaintiffs do not even provide raw percentages of the number of court interpreters and court reporters of distinct national origins.[9]

Plaintiffs argue that their statistical allegations are sufficient because they allege that court interpreters are categorically associated with people of non-Anglo national origin (Br. at 60), but that is not correct. To the contrary, the complaint acknowledges that court interpreters also interpret for deaf individuals (*e.g.*, J.A. 97), and there is no allegation in the complaint that deaf individuals are characterized by

---

[9] For this reason, plaintiffs' allegations are distinguishable from those in *Richardson v. City of New York*, No. 17-cv-9447, 2018 WL 4682224 (S.D.N.Y. Sept. 28, 2018), a district court decision cited by plaintiffs (*see* Br. at 61). In *Richardson*, unlike here, the plaintiffs alleged statistics showing both that: (1) Black employees were underrepresented at the employer; and (2) that Black employees in particular jobs were paid less than White employees performing the same jobs. *See* 2018 WL 4682224 at *2-3.

particular national origins. In any event, even if plaintiffs' characteriza-
tion of the complaint were correct, it would not raise an inference of
discrimination. The issue in *Burgis* was not that the plaintiffs failed to
plead a sufficient percentage of Black or Hispanic employees at each
employment level but that simply pleading raw percentages of those
employees was not sufficient to "show a pattern or practice that cannot
be explained except on the basis of intentional discrimination." *Burgis*,
798 F.3d at 69. Plaintiffs' complaint suffers from the same flaw, particularly
considering the significant differences in the jobs of court interpreters
and court reporters. See *supra* at 21-22.

## B. The Complaint's Other Allegations Do Not Raise a Plausible Inference of Discriminatory Intent.

Plaintiffs' remaining allegations also do not raise a plausible
inference that defendants acted with discriminatory intent in setting the
pay of court interpreters. (*See* J.A. 239.) Those allegations consist of what
plaintiffs admit are "anecdotal allegations" (Br. at 58) that some court
employees—not defendants—have mistreated court interpreters or have
acted with hostility toward them in the past.

25

As explained above (at 17-18), because plaintiffs have sued defendants in their official capacities, this suit is treated as a suit against the State, and plaintiffs must show that a State "policy or custom" played a part in the violation of federal law. *Hafer*, 502 U.S. at 25; *see Smith*, 602 F. App'x at 551. To be a policy or custom, a practice must be widespread and persistent enough to effectively function as law. *See Connick v. Thompson*, 563 U.S. 51, 61 (2011). Allegations of isolated acts of misconduct by various employees will not show the existence of a policy or custom without any allegations that decisionmakers were aware of those acts or chose to ignore them. *See Jones v. Town of E. Haven*, 691 F.3d 72, 81 (2d Cir. 2012); *Webb v. Goord*, 340 F.3d 105, 109 (2d Cir. 2003) ("Amalgamating more than forty discrete incidents of misconduct by [agency] officials does not make for a sustainable lawsuit.").

Here, plaintiffs' allegations fail to connect anecdotal allegations of mistreatment to any policy or custom regarding how defendants pay court interpreters. For example, plaintiffs do not allege that any of the court employees who allegedly mistreated court interpreters have any role or involvement in decisions regarding salary. Plaintiffs do not allege that defendants, their predecessors, or any officials involved in salary

26

decisions themselves ever mistreated any court interpreters or exhibited any hostility toward them. And plaintiffs do not allege that defendants, their predecessors, or any officials involved in salary decisions directed or condoned any of these actions, or even had knowledge of them at the time decisions regarding the salary classification of court interpreters were made. The district court therefore correctly recognized (J.A. 239) that plaintiffs' allegations fail to plausibly show that defendants acted with discriminatory intent in setting the pay of court interpreters.[10]

---

[10] In addition, with respect to Grimaldi, plaintiffs fail to plead any facts from which a court could infer that she has authority over the classifications and salaries of nonjudicial employees. Thus, as to Grimaldi, the Court could affirm on the additional ground that plaintiffs have failed to plead that she has "some connection" to the act claimed to be illegal, and—contrary to the district court's conclusion (J.A. 229)—therefore does not come within the *Ex parte Young* exception to sovereign immunity. *See Ex parte Young*, 209 U.S. 123, 157 (1908); *see, e.g., Steinberg v. Elkman*, 666 F. App'x 26, 27-28 (2d Cir. 2016); *Mendez v. Heller*, 530 F.2d 457, 460 (2d Cir. 1976). Although plaintiffs allege that Grimaldi is the Director for the Department of Human Resources for the Office of Court Administration (J.A. 80), they do not allege any of Grimaldi's responsibilities in that role, whether she has any authority to determine the salary classification of court employees, or whether she plays any role in the decision as to how court interpreters are classified.

## CONCLUSION

The judgment of the district court should be affirmed.

Dated:  New York, New York
        March 10, 2025

                                        Respectfully submitted,

                                        LETITIA JAMES
                                          *Attorney General*
                                          *State of New York*
                                        Attorney for Appellees


                                   By:   */s/ Daniel S. Magy*
                                        DANIEL S. MAGY
                                        Assistant Solicitor General

BARBARA D. UNDERWOOD              28 Liberty Street
  *Solicitor General*             New York, NY 10005
MATTHEW W. GRIECO                 (212) 416-6073
  *Senior Assistant Solicitor*
  *General*
DANIEL S. MAGY
  *Assistant Solicitor General*
      *of Counsel*

28